Casey MARTIN, Plaintiff,

v.

PGA TOUR, INC., a Maryland corporation, Defendant.

No. CIV. 97–6309–TC.

United States District Court, D. Oregon.

Jan. 30, 1998.

William Wiswall, Wiswall & Walsh, Eugene, OR, Martha Walters, Walters Romm Chanti & Dickens, Eugene, OR, for Plaintiff.

William Maledon, Scott Rogers, Osborn & Maledon, Phoenix, AZ, for Defendant.

## ORDER

COFFIN, United States Magistrate Judge:

Plaintiff brings this action pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213. On January 26, 1998, the court heard oral arguments on defendant PGA TOUR's motion (# 20) for summary judgment and plaintiff Casey Martin's cross-motion (# 44) for partial summary judgment. After argument, the court made oral findings and rulings, denying the Tour's motion in part and granting Martin's motion in part. This written order supplements and elaborates on the oral findings.

## BACKGROUND

The PGA Tour is a non-profit association of professional golfers. The PGA sponsors and cosponsors professional golf events on three tours: the regular PGA Tour, with approximately 200 players at any given time; the Senior PGA Tour, with approximately 100 players; and the Nike Tour, with approximately 170 players.

There are various ways to gain playing privileges on the tours conducted by the PGA. Chief among them is a three-stage qualifying school tournament. The first stage consists of 72 holes. Those who score well enough in this stage advance to the second stage consisting of 72 holes. The top qualifiers, approximately 168 players, advance to the third and final stage consisting of 108 holes. The lowest 35 finishers plus ties are awarded playing privileges on the regular PGA Tour. The next 70 lowest scoring players obtain privileges to play on the Nike Tour. A player failing to qualify for the

regular PGA Tour, but qualifying for the Nike Tour may obtain the privilege to play on the PGA Tour by winning three Nike Tour tournaments during a single season or by finishing in the top fifteen places on the Nike Tour money list.

To enter the qualifying school tournament, a prospective player must pay a $3,000 fee and submit two letters of reference. Plaintiff in this case entered the qualifying school tournament and made it through the first and second stages.

In the first two stages of the qualifying tournament, players are permitted to use golf carts. In the third stage, as well as on the regular PGA Tour and the Nike Tour, players are required to walk and are required to use caddies.[1] Plaintiff contends he suffers from a debilitating disease known as Klippel–Trenaunay–Weber Syndrome, and for purposes of this motion the Tour does not contest this assertion. Klippel–Trenaunay–Weber Syndrome is a venous malformation which curtails blood circulation in plaintiff's right leg. This condition has resulted in significant atrophy in the lower leg and bone deterioration of the tibia. Plaintiff further contends that his physical impairment substantially limits his ability to walk. Plaintiff filed this action, pursuant to the ADA, seeking to enjoin defendant's "no cart" rule during the third stage of the qualifying school tournament, and on the PGA and Nike Tours. Plaintiff asserts that by failing to provide him with a cart, defendant fails to make its tournaments accessible to individuals with disabilities in violation of the ADA.

This court granted a preliminary injunction directing defendant to allow plaintiff to use a cart during the third stage of the qualifying school tournament. Defendant then lifted the no cart rule for all players during the third stage of the qualifying school tournament. Plaintiff scored well enough in the tournament to attain playing privileges on the Nike Tour. This court extended the injunction by stipulation of both parties to include the first two tournaments on the Nike Tour. Defendant now moves for summary judgment contending that the ADA does not apply to it or its tournaments.

## STANDARDS

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. *Id.* at 323, 106 S.Ct. at 2552. There is also no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Taylor v. List,* 880 F.2d 1040 (9th Cir.1989).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez,* 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Insurance Co.*

---

**1.** Golf carts are permitted on the Senior PGA Tour which involves golfers 50 years and older.

*of North America,* 638 F.2d 136, 140 (9th Cir.1981).

## DISCUSSION

Plaintiff alleges in his first claim for relief that defendant is a private entity which is or operates a place of public accommodation. As a result, plaintiff contends that defendant is subject to the ADA's prohibition of discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to) or operates a place of public accommodation. *See* 42 U.S.C. § 12182. Plaintiff alleges in his second claim that defendant is a private entity that offers examinations or courses related to applications, licensing, certifications, or credentialing for professional or trade purposes. Plaintiff thus contends that defendant is subject to the ADA's requirement that any person offering examinations or courses related to applications, licensing, certification, or credentialing for professional or trade purposes shall do so in a place and manner accessible to persons with disabilities. See 42 U.S.C. § 12189. Plaintiff alleges in his third claim that defendant is an employer as defined in the ADA. *See* 42 U.S.C. § 12111(5). Thus, plaintiff contends that defendant is prohibited from discrimination against a qualified individual with a disability because of the disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

Defendant PGA Tour contends that it is entitled to summary judgment on all three of plaintiff's claims because it is private nonprofit establishment exempt from the ADA. *See* 42 U.S.C. § 12187.[2] Defendant argues, in the alternative, that even if it is not a private club it is entitled to summary judgment on counts one and two of plaintiff's complaint because the PGA and Nike Tour competitions do not constitute "places of public accommodation," and that the Nike Tour is not an examination or course. In addition, defendant argues that it is entitled to summary judgment in count three of plaintiff's complaint because plaintiff is not an "employee" of the PGA Tour.

### A. Defendant is not Exempt from the ADA

■ As noted, a private club or establishment is exempt from coverage under Title III of the ADA (as well as Title II of the Civil Rights Act of 1964, which prohibits discrimination on the grounds of race, color religion, or national origin). Because of the importance of these laws, exemptions are narrowly construed and the burden of proof rests on the party claiming the exemption. *See Nesmith v. YMCA,* 397 F.2d 96, 101 (4th Cir.1968); *Quijano v. University Federal Credit Union,* 617 F.2d 129, 131–32 (5th Cir. 1980).

Before one can answer the question of whether the PGA Tour is entitled to the private club exemption, one must first define the nature of the entity:

■ Succinctly put, the Tour is an organization formed to promote and operate tournaments for the economic benefit of its members, a highly skilled group of professional golfers. As with all professional sports organizations, the Tour is part of the entertainment industry, offering competitive athletic events to the public, which in turn generate sponsorship of the events, network fees, advertising revenue, and, ultimately, the tournament prize money awarded the competitors.

The Tour, in short, is a commercial enterprise. The success of the Tour in generating revenue for its members is in direct proportion to public participation as spectators and viewers of the Tour's tournaments. Without this public participation, the primary objective of the Tour could not be achieved.

One of the principal cases relied upon by the PGA for its exemption claim actually cuts against its position:

Title I (prohibiting discrimination with regard to employment), an employer does not include a bona fide private membership club. *See* 42 U.S.C. § 12111(5)(B).

**2.** The exemption from coverage under the ADA found at 42 U.S.C. § 12187 applies to Title III of the ADA (public accommodations and services operated by private entities). With respect to

In *Welsh v. Boy Scouts of America,* 993 F.2d 1267 (7th Cir.1993), the court found that the Boy Scouts was indeed a private club notwithstanding its membership total of over five million scouts.[3] The *Welsh* court focused keenly on the purpose of membership in the Scouts when it criticized the dissenter's emphasis on the size of the organization:

The dissent concludes that because the Boy Scouts have five million members ... it is neither selective nor private.... This conclusion not only exaggerates the facts, it ignores the purpose of the Scouts' existence and punishes the Boy Scouts for its success in recruiting future quality leaders of society. Certainly Congress did not intend to condition the private club exclusion from Title II on the popularity of the organization. *The more pertinent factor regarding selectivity is the nexus between the organization's purpose and its membership requirements.*

*Id.* at 1277. (emphasis added).

Regarding that purpose, the court had earlier observed:

The purpose of Scouting ... is to equip youth of all races, colors and creeds to fulfill their duty to God, to mature personally, and to help others. This can only be achieved by a boy who believes in God. How does one who denies the very existence of a Supreme Being presuppose to follow the Oath of the Boy Scouts of America?

*Id.*

■ Just as the large membership in the Scouts did not deprive the organization of its private club status when its membership requirements were fitted with the purpose of the group, so the relatively small membership of the PGA Tour does not confer private status on this entity when its selectivity is counterbalanced with the Tour's purpose. Generating revenue for members scarcely seems to qualify as the type of protectable interest Congress had in mind when it excluded private clubs from coverage under the ADA and Civil Rights Act.

In *Quijano v. University Federal Credit Union,* 617 F.2d 129 (5th Cir.1980), The court ruled that the private membership club exception to the Civil Rights Act did not apply to a federally chartered credit union, notwithstanding its non-profit status. In doing so the court observed:

One rarely abandons the path of logic and common sense when Webster is consulted for the precise meaning of a term. In reference to the type of club suggested by section 701(b)(2) exemption Webster's Third International Dictionary of the English Language offers the following definition at page 430:

club: an association of persons for social and recreational purposes or for the common promotion of some common object (as literature, science, political activity) usually jointly supported and meeting periodically, membership in social clubs usually being conferred by ballot and carrying the privilege of use of the club property.

. . . .

Credit unions, however useful they may be, exist for purely mercantile purposes and although they may be organized on a non-profit basis, member join credit unions in search of profits on their investments. Like ... "auto clubs," credit unions are not clubs in any sense of the word.

*Id.* at 131, 133.

■ An analysis of the set of variables most commonly weighed by the courts in determining whether an organization is a bona fide private club mitigates against such a finding here. Those factors, as set forth in *United States v. Lansdowne Swim Club,* 713 F.Supp. 785 (E.D.Pa.1989) are listed and discussed as follows:

### 1. Genuine Selectivity

■ The Tour contends that because only very few golfers possess the requisite skills to become members of the Tour and compete at its events, and because these golfers are selected through competition at qualifying tournaments, its members are chosen

---

**3.** Although the *Welsh* case involved the Civil Rights Act, the ADA and the Civil Rights Act are interrelated in terms and application.

through an exceptionally selective process and this factor weighs heavily in its favor.

■ Defendant's eligibility requirements, however, measure skills. They are not designed to screen out members based upon social, moral, spiritual, or philosophical beliefs, or any other criteria used to protect freedom of association values which are at the core of the private club exemption. *See Quijano*, 617 F.2d 129; *Welsh*, 993 F.2d 1267. *See also United States v. Jordan*, 302 F.Supp. 370, 376 (consideration is given to whether the organization has a civic, fraternal, or social purpose accomplished through membership screening). As with all sports, only the most skilled players achieve professional status. The pool of professional competitors will always be an extremely small percentage of those who participate in the sport at recreational or other non-professional levels, not to mention the general public. Such natural "weeding-out" selectivity is inherent to athletics, and does nothing to confer "privacy" to the organizations to which professionals matriculate.

### 2. Membership Control

Professional golfers who play in fifteen or more regular PGA Tour events in a year have voting rights.[4] But—which seems more to the point—new members are not voted in by the current members—they play their way in. *See Jordan*, 302 F.Supp. at 375 (consideration is given to whether the existing members have any control over the admission of applicants for membership). The membership control of the organization does little to make it or keep it "private."

### 3. History of Organization

The organization has existed since 1968. It clearly was not formed to evade the Civil Rights Act or ADA. Of course, the fact that an organization is not a "sham" tells us it is "bona fide," but not that it is a "private club."

### 4. Use of Facilities by Nonmembers

Defendant contends that only its members participate as players in Tour Events. Plaintiff points to numerous nonmembers who participate in the tournaments as vendors, reporters, score keepers, volunteers, and members of the gallery.

The court finds this factor cuts against private club status. Of particular force is the heavy reliance by the Tour on public participation for the purpose of generating revenue for the tour. *See Smith v. YMCA*, 462 F.2d 634, 648 (5th Cir.1972) (a YMCA which enjoyed a substantial amount of revenue from the general public was not a private club); *Evans v. Laurel Links, Inc.*, 261 F.Supp. 474 (E.D.Va.1966) (a golf club which opened its lunch counter to the public, which restaurant generated $27,568 in revenue for the club, thereby subjected the entire golf course to the Civil Rights Act).

### 5. Club's Purpose

As discussed previously, the mercantile purpose of the PGA Tour weighs heavily against private club status.

### 6. Whether the Club advertises for Members

■ Courts have held that organizations which advertise and solicit new members do not fall within the private club exemption. *See Wright v. Salisbury Club, Ltd.*, 632 F.2d 309 (4th Cir.1980).

The PGA Tour is extensively covered by the media. Its existence is well known to even the most casual golfers and followers of sports. The Tour has no more need or incentive to advertise for golfers than do the Chicago Bulls for basketball players. The advertising factor carries little weight in the arena of professional sports.

### 7. Whether the Club is Nonprofit

The Tour is nonprofit, but yet its fundamental purpose is to enhance profits for its members. As in *Quijano*, the nonprofit status of a corporation that exists to further the commercial interests of its members does not weigh in favor of exempt status.

---

4. The voting rights these golfers have is limited to voting for player directors from a slate of candidates chosen by the existing player directors. Only four members of the policy board, consisting of nine members, are player directors.

For the reasons stated, I reject the PGA Tour's argument that it is a private club and as such exempt from the ADA.

### B. Defendant Operates a Place of Public Accommodation at the Golf Courses on which it Conducts its Tournaments

Defendant further contends that, if it is not found to be an exempt private club, the courses it operates are not open to the "general public" between the boundaries of play during its tournaments, and thus the tournament events are not "places of public accommodation." [5]

The term "public accommodation" is specifically defined to include the following places:

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, *golf course,* or other place of exercise or recreation.

42 U.S.C. § 12181(7) (emphasis added).

A golf course is specifically included on the list.

Defendant argues, however, that its courses are only places of public accommodation in those areas actually accessed by the public at large. It contends that since the public gallery is not allowed inside the playing area, the fairways and greens of its golf courses are not places of public accommodation.

This argument is flawed.

First, if the PGA were correct, this renders the private club exemption virtually irrelevant to the issue of whether so-called private country clubs, for example, must comply with the ADA. Using the logic of the PGA, if the country club were found not to be a "bona fide private membership club" (as the term is discussed in the previous section), it could nonetheless refuse to accommodate any handicapped members by pointing out it only admits the country club's members (and not the public at large) on its grounds.

Second, the statute and regulations do not support the concept that places of public accommodation have zones of ADA application. PGA cites cases wherein private facilities do not lose their exempt status on the private portions of its facilities simply by operating a discrete public accommodation area (e.g., a private country club renting space to a private day care center open to nonmembers has ADA obligations only with respect to the day care center, according to DOJ regulations). But this is a far cry from the proposition that an operator of a place of public accommodation can create private enclaves within the facility of public accommo-

---

5. Under the ADA, reasonable accommodations must be afforded the disabled using places of  public accommodations.

dation and thus relegate the ADA to hop-scotch areas. May the day care center in the above example rope off a section for use only by the country club's members and be exempt from the ADA within those boundaries? I think not.

The PGA further cites, as an example of dual public/private zones of public accommodation places, the typical major league baseball stadium. The PGA argues that the bleachers are subject to the ADA because that is where the public is seated, but the dugout is not because the public is not allowed to mingle with the players therein.

What about a disabled manager of a team? May the St. Louis Cardinals refuse to construct a wheelchair ramp to the visitor's dugout to accommodate a disabled manager of the Chicago Cubs simply because spectators cannot go into the dugout?

In a somewhat similar case regarding the Rose Garden Arena, Magistrate Judge Donald Ashmanskas in finding that the executive suites in the arena, even though not open to the general public, are subject to the ADA stated:

> Many facilities that are classified as public accommodations are open only to specific invitees. For instance, a facility that specializes in hosting wedding receptions and private parties may be open only to invitees of the bride and groom, yet it clearly qualifies as a public accommodation. *See* 42 U.S.C. § 12181(7). Attendance at a political convention is strictly controlled, yet the convention center is still a place of public accommodation. *See* 42 U.S.C. § 12181(7). A gymnasium or golf course may be open only to authorized members and their guests, but that does not necessarily preclude it from being classified as a place of public accommodation. *Id.* A private school may be open only to enrolled students, but it is still a place of public accommodation. *Id.*

*Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698, 758–59 (D.Or. 1997)

What the PGA also overlooks is that people other than its own Tour members are indeed allowed within the boundary lines of play during its tournaments. What if a member-golfer opted to hire a disabled cad-dy? Once the caddy steps within the boundaries of the playing area of the golf course—a statutorily defined place of public accommodation—does he step outside the boundaries of the ADA simply because the public at large cannot join him there? If this were the law, how could such be reconciled with the inclusion of *private* schools, whose corridors, classrooms, and restrooms are clearly not accessible to the public, on the list of places of public accommodations?

Accordingly, I reject defendant's argument that the ADA does not apply to the areas of competition on the golf course during tournaments.

**C. Issue of Employment and Whether the Nike Tour is a Course or Examination**

Whether plaintiff is an employee of the Tour and whether the Nike Tour constitutes an examination or course within the meaning of the ADA are issues that I defer until the trial of the case.

## CONCLUSION

For the reasons stated above, defendant's motion (# 20) for summary judgment is denied. Plaintiff's motion (# 44) for partial summary judgment is granted as to the issue of whether defendant is exempt from the ADA and whether defendant operates a place of public accommodation, and is otherwise denied.