Michael BOWERS, Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., Defendants.

Civ. A. No. 97–2600.

United States District Court, D. New Jersey.

Aug. 14, 1997.

Barbara E. Ransom, Philadelphia, PA, Penelope A. Boyd, Mount Laurel, NJ, Richard L. Bazelon, Bazelon & Less, Marlton, NJ, for Plaintiff.

J. Freedley Hunsicker, John F. Schultz, Drinker, Biddle & Reath, LLP, A Pennsylvania Limited Liability Corporation, Princeton, NJ, for Defendants, The National Collegiate Athletic Association and Cedric W. Dempsey.

Nicholas M. Kouletsis, Pepper Hamilton & Sheetz, LLP, Cherry Hill, NJ, Robert A. Burgoyne, Fulbright & Jaworski, LLP, Washington, D.C., for Defendants, NCAA Initial Eligibility Clearinghouse and Calvin Symons.

## OPINION

ORLOFSKY, District Judge.

Plaintiff, Michael Bowers, has moved for a preliminary injunction pursuant to Fed. R.Civ.P. 65. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343. The principal issue raised by Plaintiff's motion, an issue of first impression in this Circuit, is whether Plaintiff, who is "learning disabled," can show a reasonable likelihood that he will succeed on his claim that his classification by the National Collegiate Athletic Association ("NCAA") as a "nonqualifier" within the meaning of the NCAA bylaws, constitutes illegal disability-based discrimination in violation of the Americans with Disabilities Act. 42 U.S.C. §§ 12101, *et seq.*[1]

---

1. Although Plaintiff's underlying complaint also seeks relief pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and the Sherman Act, 15 U.S.C. § 1, Plaintiff bases his claim for preliminary injunctive relief solely upon his Americans with Disabilities Act claim.

Plaintiff seeks an order from this Court requiring, pending further order of the Court: (1) Defendant, NCAA Initial Eligibility Clearinghouse, to revise Plaintiff's initial eligibility to declare him a "qualifier;" and (2) Defendant, NCAA, directly or through a member institution, to provide Plaintiff all the benefits and privileges of "qualifier" status. For the reasons that follow, Plaintiff's motion for a preliminary injunction will be denied.

## I. Factual Background

### A. *The NCAA Bylaws and the Certification Process*

The National Collegiate Athletic Association ("NCAA") is a private unincorporated association comprised of approximately 1200 colleges and universities. (Karpinski Aff. ¶ 2; N.T. 7/23/97, pp. 146–147). The general policies of the NCAA are established by its members at annual conventions. (Karpinski Aff. ¶ 3). The NCAA Constitution, Bylaws and other governing legislation are set forth in the NCAA Manual, which is published annually and distributed to all member institutions. (Exhibit D–1).

The NCAA bylaws require, among other things, that all NCAA member institutions establish minimum academic eligibility standards for all prospective students who wish to participate in intercollegiate athletics at the institution and receive athletic scholarships from the institution during their freshman year. The eligibility requirements are designed to assure proper emphasis on educational objectives, to promote competitive equity among institutions and to prevent exploitation of student athletes. (Karpinski Aff. 96; N.T. 7/22/97, p. 171; N.T. 7/23/97, pp. 151–152). In furtherance of these goals, the NCAA requires that any prospective student who wishes to participate in intercollegiate athletics at a member institution and receive athletic scholarships from the member institution during his or her freshman year be certified as a "qualifier" by the

NCAA Initial Eligibility Clearinghouse (the "Clearinghouse").[2] (Ex. D–1, Bylaws 14.01.1, 14.02.9).

In order to be certified as a "qualifier," NCAA bylaws provide that a student must graduate from high school, pass at least thirteen classes in what the NCAA defines as a "core course," with a minimum grade-point average that varies based on the strength of the student's standardized test score. (Ex. D–1). The NCAA bylaws define "core course" as a recognized academic course that offers fundamental instructional components in a specified area of study. (Ex. D–1, Bylaw 14.3.1.1.1).

The definition of "core course" contained in the NCAA bylaws expressly excludes courses taught below the high school's regular academic instructional level, including remedial, special education or compensatory courses, regardless of the content of the course. (Ex. D–1, Bylaw 14.3.1.3.4). The bylaws do provide, however, that special education courses for the learning disabled may fulfill the core-curriculum requirements if the student's high school principal submits a written statement to the NCAA indicating that students in such classes are expected to acquire the same knowledge, both quantitatively and qualitatively, as students in other core courses. (Ex. D–1, Bylaw 14.3.1.3.4). The same required core courses and grade point average must nevertheless be achieved by a learning disabled student.

A student seeking certification by the Clearinghouse must pay a fee and submit to the Clearinghouse an application along with a release form. Upon receiving a student's application and release form, the Clearinghouse applies the NCAA's initial eligibility requirements and certifies the status of a prospective freshman student-athlete on a form known as a "48–C". (N.T. 7/21/97, pp. 36–37; Ex. P–1h). Although preliminary certifications may be made while a student is still in high school, the Clearinghouse does not make a final certification for a student

---

**2.** The Clearinghouse is a division of the American College Testing Service ("ACT"), which operates under a contract between ACT and the NCAA to determine the eligibility of prospective student athletes. (N.T. 7/21/97, pp. 11–14). The

NCAA has delegated to the Clearinghouse the authority to determine the eligibility of students to participate in athletics at, and to receive athletic scholarships to member institutions during their freshman year. (*Id.*).

until it receives the student's final high school transcript after graduation. (N.T. 7/21/97, p. 75; N.T. 7/22/97, pp. 80–81; N.T. 7/23/97, p. 138).

In determining whether a particular course constitutes a "core course" within the meaning of the NCAA bylaws, the Clearinghouse first looks to the high school's "48–H Renewal Form" on which each high school is asked to list all courses which school officials believe meet the NCAA "core course" requirements. (Ex. P–2 to P–6; N.T. 7/21/97, p. 71). If a particular course is not listed on the school's "48–H Renewal Form," the Clearinghouse may nevertheless approve the course if the school has submitted sufficient documentation establishing that the course deserves "core" status.

In the event the Clearinghouse determines that a particular student should not be certified as a "qualifier," the bylaws further authorize the NCAA to grant a waiver of the academic eligibility requirements "based on objective evidence that demonstrate circumstances in which a student's overall academic record warrants the waiver of the normal application" of the requirements. (Ex. D–1, Bylaw 14.3.1.7). Waiver requests are considered by the NCAA Council Subcommittee on Initial–Eligibility Waivers (the "Subcommittee"). Generally, the Subcommittee will review any materials that the student wishes to submit in support of his or her application for a waiver. (Ex. D–5). In the case of a student seeking a waiver based on a learning disability, or a "LD Waiver," the Subcommittee will review, among other things, the student's Individual Education Program ("IEP"), as well as the content of the "noncore" courses taken by a student. (N.T. 7/23/97, pp. 191–192).

Although the bylaws preclude a student who neither obtains "qualifier" status, nor obtains a waiver of the initial eligibility requirements, from participating in intercollegiate athletics and receiving an athletic scholarship during the freshman year, the bylaws do not preclude such a student from receiving academic or need-based financial aid or from participating in athletics and receiving athletic scholarship funds from a member institution during his or her remaining college years.

### B. Michael Bowers

Michael Bowers is presently a freshman at Temple University in Philadelphia, Pennsylvania. (N.T. 7/23/97, p. 306). From the time Bowers was in second grade, until his graduation from Palmyra High School in Palmyra, New Jersey, in June 1996, he received special education and related services to accommodate a learning disability. (Ex. P–24c). Many of the courses that Bowers took while enrolled at Palmyra High School ("Palmyra") were special education courses, labeled as "SE." (N.T. 7/21/97, p. 217).

Notwithstanding Bowers's learning disability, he is by all accounts a talented football player. Bowers was on the Palmyra High School football team during all four years that he was enrolled at Palmyra. (N.T. 7/23/97, pp. 256–257). As such, in September 1995, Bowers submitted an application and student release form to the Clearinghouse, seeking certification as a "qualifier" in order to participate in athletics and receive an athletic scholarship from an NCAA member institution during his freshman year of college. (Ex. P–1f).

The Clearinghouse first began to review Bowers's certification status in April 1996. (Ex. D–6, p. 54). Upon reviewing Bowers's application and high school transcript, the Clearinghouse noted that on his transcript, several courses taken by Bowers had certain letter designations after them, indicating that such courses were special education courses. (Ex. D–6, p. 54). The Clearinghouse then noted that none of the special education courses taken by Bowers was listed on Palmyra's 48–H Renewal Form. (Exs.P2–P5). The Clearinghouse requested additional information and documentation from Palmyra on these specific courses in order for it to consider these courses "core courses" within the meaning of the NCAA bylaws. (Ex. D–6, p. 54).

After receiving some general information about the special education courses taken by Bowers from Ms. Toni Goldman, a guidance counselor at Palmyra, the Clearinghouse requested more specific course information and

clarification from Palmyra. (Ex. P–25b). The Clearinghouse specifically requested that Palmyra provide it with a course description, course syllabus and table of contents for each special education course taken by Bowers, as well as for each regular education course with which the school believed each special education course was comparable. (Ex. D–6, p. 51).

Although both Ms. Goldman and Ms. Dori Levy, Director of Special Services for Palmyra Public Schools, sent the Clearinghouse additional information regarding some of the special education courses taken by Bowers, the Clearinghouse never received all of the information it sought. (Ex. D–6, p. 54). In fact, in her letter to the Clearinghouse, Ms. Levy also informed the Clearinghouse that there was no equivalent regular education course for the English CA course that Bowers has taken. (Ex. P–24c). Ms. Levy also noted in her May 17, 1996, letter to the Clearinghouse that the Biology I SE and Biology II SE courses that Bowers had taken were the equivalent of one regular education biology course. She also indicated that Bowers's English DC and English Comp. C courses combined together to form the equivalent of one regular education English course. (Ex. P–24c).

In June 1996, based on the information that it had received from Palmyra, the Clearinghouse concluded that only three special education courses taken by Bowers qualified as "core courses." The Clearinghouse again advised Palmyra that many of the submitted courses "remained questioned" and that the Clearinghouse needed additional information about the courses in the form of tables of contents and syllabi for each course. (Exs. P–7, D–6, p. 55, and D–16). In July 1996, without receiving any additional information, the Clearinghouse's Final Certification Report classified Bowers as a "nonqualifier," noting that Plaintiff had met only three of the requisite thirteen "core course" requirements. (Exs.P–1h, Ex. D–6, p. 55).

As a result of his "nonqualifier" classification, Bowers is neither eligible to play intercollegiate football for an NCAA member institution during his freshman year, nor eligible to receive an athletic scholarship from a member institution in his freshman year. Nevertheless, Bowers enrolled at Temple University, an NCAA member institution, as a freshman in January, 1996. (N.T. 7/23/97, p. 306).

On May 23, 1997, Plaintiff filed a complaint in this Court, alleging that his classification as a "nonqualifier" within the meaning of the NCAA bylaws constituted a violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.,* Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and the Sherman Act, 15 U.S.C. § 1. Plaintiff seeks both injunctive and monetary relief in his complaint.

Along with his complaint, Bowers also filed a motion for a preliminary injunction seeking an order from this Court requiring, pending further order of the Court: (1) Defendant, Clearinghouse, to revise his initial eligibility to declare him a "qualifier," and (2) Defendant, NCAA, directly or through a member institution, to provide him all the benefits and privileges of "qualifier" status.

After Bowers filed his complaint and motion for preliminary injunctive relief, this Court instructed the NCAA to determine, on an expedited basis, whether Bowers was entitled to a waiver of the initial eligibility requirements pursuant to NCAA bylaw 14.3.1.7 before it would rule on Bowers's motion for a preliminary injunction. The Subcommittee that considered Bowers's waiver request was comprised of four individuals—Dr. Race Bergman, who has a doctorate in the field of learning disabled content and curriculum and has been working in the area for 35 years; Dr. David Rasky, the Vice President for Academic Affairs at California State and a specialist in Learning Disabled Affairs; Ms. Sandra Sappone, who holds a Masters Degree in Special Education and has taught in IEP Programs; and Dr. Susan Berner, who is on staff at Campbell University and practices in the field of special education. (N.T. 7/22/97, pp. 109–110; N.T. 7/23/97, pp. 159–161).

In considering Bowers's request for a waiver, the Subcommittee considered whether Plaintiff would be able to succeed academically during his first year of college

while also confronting the demands of participating in an intercollegiate sports program. The Subcommittee unanimously agreed that, based on the quality of Bowers's high school courses and his overall record, he would not be able to do so. The Subcommittee, therefore, did not grant Bowers a waiver of the initial eligibility requirements. (N.T. 7/22/97, p. 188; N.T. 7/23/97, p. 179).

A preliminary injunction hearing in this matter was conducted before this Court on July 21, 22 and 23, 1997.

## II. Discussion

Before a district court will grant preliminary injunctive relief in this Circuit, the court must weigh the following four factors: (1) the likelihood of success on the merits; (2) whether the movant will be irreparably injured if relief is not granted; (3) whether the party to be enjoined will suffer irreparable injury if the preliminary relief is granted; and (4) whether the public interest will be served by the preliminary injunctive relief. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997); *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989); *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982); *Value Group, Inc. v. Mendham Lake Estates, L.P.,* 800 F.Supp. 1228 (D.N.J.1992).

### A. Likelihood of Success on the Merits of Bowers's ADA Claim

As noted above, to obtain preliminary injunctive relief, a plaintiff must first show a "reasonable probability of eventual success in the litigation." *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982). Bowers contends that he has met this criterion on his Americans with Disabilities Act ("ADA") claim.

Congress enacted the ADA in 1990 in order "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In enacting the ADA, Congress found that:

> individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

42 U.S.C. § 12101(a)(7). *See also Lake v. Arnold,* 112 F.3d 682, 687–88 (3d Cir.1997).

Title III of the ADA provides in relevant part that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

The Act defines "discrimination" within the meaning of § 12182(a), to include:

> (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;
>
> (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

42 U.S.C. § 12182(b)(2)(A)(i) and (ii).

Thus, a finding of illegal discrimination under either subpart (i) or (ii) of § 12182(b)(2)(A) requires the employment of a two-part test. Essentially, a court must first determine whether a defendant either:

(i) imposed eligibility criteria that tended to screen out an individual with a disability, or (ii) failed to make reasonable modifications in policies, practices, or procedures, which were necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. If a plaintiff establishes a *prima facie* case of discrimination by demonstrating either (i) or (ii), the burden then shifts to the defendant to show that, without the use of such eligibility criteria, or by making such modifications, the nature of the good, service, facility, privilege, advantage, or accommodation offered by the defendant would be fundamentally altered.

█ While NCAA bylaw 14.3.1.3.4, which expressly excludes special education courses from the definition of "core course," may, when viewed in isolation, appear to "screen out or tend to screen out" persons on the basis of their disability, this one bylaw must be viewed in the context of the NCAA bylaws and procedures as a whole. Indeed, the NCAA bylaws, themselves, provide for two alternate avenues by which a learning disabled student who has taken numerous special education courses, that would not otherwise qualify as "core courses," may obtain the status of a "qualifier."

First, the bylaws provide that courses for the learning disabled may fulfill the core-curriculum requirements if the student's high school principal demonstrates that students in such classes are expected to acquire the same knowledge, both quantitatively and qualitatively, as students in other core courses. (Ex. D–1, Bylaw 14.3.1.3.4).

Second, the bylaws also authorize the NCAA to grant a waiver of the initial academic eligibility requirements "based on objective evidence that demonstrate circumstances in which a student's overall academic record warrants the waiver of the normal application" of the requirements. (Ex. D–1, Bylaw 14.3.1.7; Karpinski Aff. ¶ 28). While prior to August 1996, such a waiver request could be initiated only at the request of an NCAA member institution, effective August 14, 1996, an individual with a learning disability such as Bowers may seek the waiver on his own behalf. (N.T. 7/22/97, p. 153).

In fact, Plaintiff has availed himself of both alternate avenues in hopes of attaining the status of "qualifier." After the Clearinghouse first noted that Bowers had taken several special education courses which would ordinarily not count as courses under Bylaw 14.3.1.3.4, the Clearinghouse requested additional information from Palmyra on specific course designations that appeared on Plaintiff's transcript. After receiving some information about the courses from the school, the Clearinghouse again requested more specific course information and clarification from Palmyra. (Karpinski Aff. ¶ 26).

In June 1996, Clearinghouse staff reviewed the additional course information that had been provided by Palmyra High School, and based on this additional information, qualified three courses completed by Plaintiff as "core courses." The Clearinghouse then advised Palmyra that many of the submitted courses "remained questioned" and the Clearinghouse needed additional information about the courses in the form of a table of contents and syllabus for each of the courses. Without receiving any additional information, the Clearinghouse's final Initial Eligibility Certification Report noted that Plaintiff had not met the "core course" requirements necessary to obtain the status of a "qualifier." (Karpinski Aff. ¶ 27).

Prior to the preliminary injunction hearing in this matter, I instructed the NCAA to consider Bowers's application for a waiver of the initial eligibility requirements pursuant to NCAA Bylaw 14.3.1.7 on an expedited basis. Every waiver request, submitted by or on behalf of a learning disabled student is considered by the NCAA Council Subcommittee on Initial–Eligibility. In considering a waiver application, the Subcommittee evaluates each submission on a case-by-case basis, and looks at the student's overall record during his or her high school career to ascertain if it is sufficiently strong to predict the likelihood of the student's academic success in the first year of college.

In Bowers's case, the Subcommittee considered Bowers's "Clearinghouse file," affidavits from Michael Bowers and Dori Levy, and Bowers's transcript from his first semes-

ter at Temple University. (Ex. D–6). The Subcommittee also reviewed his Individual Education Program ("IEP") to gain further information about Bowers's disability and to determine whether the courses in dispute were specifically listed by the student's high school IEP Team as courses necessary to address his disability.

Although Bowers argues that it was improper for the Subcommittee to "second guess" his learning disability diagnosis, the record reveals that the Subcommittee accepted Bowers's diagnosis and disregarded a letter from Dr. Robert Colson, an outside consultant, which questioned Bowers's diagnosis as learning disabled. (N.T. 7/23/97, p. 178). Bowers's initial IEP, formulated in 1992, indicated that Bowers planned to attend a Community College after graduation from Palmyra. (N.T. 7/22/97, p. 203; Ex. P–1c). However, Bowers's 1994 IEP revealed that he hoped to attend a college or university. (N.T. 7/22/97, pp. 203–204; Ex. P–1d).

The Subcommittee considered all the materials submitted by Bowers in support of his waiver application. The Subcommittee credited only four more of Bowers's courses as "core courses," and unanimously concluded that Bowers would not be able to succeed academically during his first year of college, while also confronting the demands of competitive intercollegiate athletics. (N.T. 7/22/97, p. 188; N.T. 7/23/97, p. 179).

By filing this lawsuit, Plaintiff is essentially seeking a "second bite" at the waiver which the NCAA has already denied him. In his complaint and accompanying motion for preliminary injunctive relief, Plaintiff asks this Court to order the NCAA to consider all of his special education courses, regardless of their level or content, as "core courses" within the meaning of the bylaws. By doing so, Plaintiff seeks a virtual elimination of the "core course" requirement, rather than merely the "modification" or "accommodation" required by the ADA, which the NCAA already provides.

■ To count all of Bowers's special education courses as "core courses," without regard to their level or content would require the NCAA to abandon its eligibility requirements. While the ADA requires "evenhand-ed treatment" of individuals with disabilities, it does not require "affirmative action." *Sandison v. Michigan High School Athletic Association,* 64 F.3d 1026, 1031 (6th Cir. 1995).

Indeed, the ADA "does not require the NCAA to simply abandon its eligibility requirements, but only to make reasonable modifications to them." *Ganden v. NCAA,* No. 96–C–6953, 1996 WL 680000, *16 (N.D.Ill. Nov. 21, 1996). Under the ADA, a requested modification is unreasonable if it "would 'fundamentally alter' the nature of the privilege or accommodation to which [a plaintiff] has been denied access." *Id.* at *14. Simply requiring a reduction in the essential eligibility standards is not a reasonable modification. *Pottgen v. Missouri State High School Activities Ass'n,* 40 F.3d 926, 931 (8th Cir.1994).

■ Eligibility requirements are "essential" or "necessary" when they are reasonably necessary to accomplish the purposes of a program. *Sandison,* 64 F.3d at 1034–1035; *Pottgen,* 40 F.3d at 929. The basic purpose of the NCAA is to maintain intercollegiate athletics as an integral part of the educational program and to assure that those individuals representing an institution in intercollegiate athletics competition maintain satisfactory progress in their education. (Bylaw 1.3). By enacting the initial eligibility requirements, the NCAA seeks to:

(1) insure that student-athletes are representative of the college community and recruited solely for athletics; (2) insure that a student athlete is academically prepared to succeed at college; and (3) preserve amateurism in intercollegiate sports.

*Ganden,* 1996 WL 680000, *14.

Moreover, the core course requirement serves "the dual interest of insuring the integrity of [a student's] GPA and independently insuring that the student has covered the minimum subject matter required for college." *Id.* at *15. Thus, the NCAA initial eligibility criteria are essentially minimum requirements which assure that freshman student-athletes are sufficiently able to handle college academic work, along with the

demands of participating in intercollegiate athletics during their first year of college.

In finding the NCAA "core course" definition essential to the NCAA's provision of the privilege of participation in the NCAA's intercollegiate athletic program, the court in *Ganden* stated that:

> While Title III may require the NCAA to count courses as "core" even if they are not substantively identical to approved "core courses," it does not require the NCAA to count courses with little substantive similarity. Whatever skills such a course may provide to the student, they cannot be said to substitute for earlier "core courses." Similarly grades from such courses do not provide valid indications of the student's academic potential.

*Id.* at *15.

I agree with the court in *Ganden* in finding that a complete abandonment of the "core course" requirement would fundamentally alter the nature of the privilege of participation in the NCAA's intercollegiate athletic program. Although the bylaws provide that special education courses will not ordinarily count as "core courses," I find that by providing that courses for the learning disabled may fulfill the core-curriculum requirements if the student's high school principal submits a written statement to the NCAA, as well as by authorizing the NCAA Council to waive the initial academic eligibility requirements on a case-by-case basis, the bylaws provide for individualized consideration which is a more than adequate reasonable accommodation for students with learning disabilities.

Only seven of Bowers's high school courses qualified as core courses within the meaning of the NCAA bylaws. I find that Bowers failed to satisfy the initial eligibility requirements because he failed to meet the NCAA's core course requirement, not because of his learning disability. The ADA is meant to provide a remedy for those who have been victimized by illegal disability-based discrimination—it is not meant to provide a remedy for every individual who has been screened out by eligibility criteria for whatever reason.

■ For the foregoing reasons, I find that Plaintiff has not shown a likelihood of success in establishing that the NCAA bylaws as a whole impose eligibility criteria that tend to screen out individuals with a learning disability. Thus, I find that Plaintiff has failed to establish a reasonable likelihood that he will succeed on his discrimination claim under the ADA. Accordingly, Plaintiff's motion for a preliminary injunction will be denied.[3, 4]

This Court will enter an appropriate order.

## ORDER

This matter having come before the Court on Plaintiff's application for a preliminary injunction pursuant to Fed.R.Civ.P. 65, Barbara E. Ransom, Esq., of the Public Interest Law Center of Philadelphia, Richard L. Bazelon, Esq., of Bazelon & Less, and Penelope A. Boyd, Esq., appearing on behalf of Plaintiff, Michael Bowers, J. Freedley Hunsicker, Esq., and John F. Schultz, Esq., of Drinker, Biddle & Reath, LLP, appearing on behalf of Defendants, The National Collegiate Athletic Association and Cedric W. Dempsey, and Nicholas M. Kouletsis, Esq., of Pepper Ham-

---

**3.** Because Plaintiff has not shown a likelihood of success on his ADA claim, I need not address the remaining criteria for the grant or denial of preliminary injunctive relief, irreparable harm, balance of hardships, or the public interest, at this juncture in the case.

**4.** Section 1343 of Title 28 vests a federal district court with original jurisdiction over any civil action such as the present action, "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights ..." 28 U.S.C. § 1343(a)(4). Thus, I conclude that whether the NCAA or the Clearinghouse "is a place of public accommodation" or "operates a place of public

accommodation," within the meaning of the ADA, do not present issues relating to subject matter jurisdiction.

Accordingly, I need not resolve these issues in order to rule on Plaintiff's motion for a preliminary injunction, because I find that Plaintiff has failed to establish a likelihood of success in demonstrating that either the NCAA or the Clearinghouse discriminated against him on the basis of his disability. Whether the NCAA or the Clearinghouse "is a place of public accommodation" or "operates a place of public accommodation," within the meaning of the ADA, are questions that can be presented to the Court again in the form of a dispositive motion.

ilton & Sheetz, LLP, and Robert A. Burgoyne, Esq., of Fulbright & Jaworski, LLP, appearing on behalf of Defendants, NCAA Initial Eligibility Clearinghouse and Calvin Symons; and,

The Court having considered the written submissions of the parties filed in support of, and in opposition to Plaintiff's application, the testimony of witnesses and the exhibits at the preliminary injunction hearing conducted in this case on July 21, 22 and 23, 1997, and the post-hearing submissions of the parties;

For the reasons set forth in this Court's Opinion filed concurrently with this Order;

IT IS HEREBY ORDERED on this 14th day of August, 1997, that Plaintiff's application for a preliminary injunction is denied; and,

IT IS HEREBY FURTHER ORDERED that within ten (10) days of the date of this Order, counsel for the parties shall contact this Court to schedule a telephone conference call in this case to establish a briefing schedule for the filing of dispositive motions.