**Casey MARTIN, Plaintiff,**

**v.**

**PGA TOUR, INC., a Maryland corporation, Defendant.**

No. 97–6309–TC.

United States District Court,
D. Oregon.

Feb. 19, 1998.

Martha Lee Walters, Walters Romm & Chanti, Eugene, OR, William H. Wiswall, Wiswall & Walsh PC, Eugene, OR, for Plaintiff.

George J. Cooper, III, Dunn Carney Allen Higgins & Tongue, Portland, OR, William J. Maledon, Scott W. Rodgers, Osborn Maledon PA, Phoenix, AZ, for Defendant.

Garr M. King, Kennedy Watts Arellano & Ricks LLP, Portland, OR, for Amicus.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COFFIN, United States Magistrate Judge.

This case presents profound questions regarding the application of the Americans with Disabilities Act (ADA). Does the ADA apply to athletic events or sports organizations? If so, are the most elite events and organizations, such as those at the professional level, somehow exempt from coverage? If the ADA is applicable, may a rule of competition be modified to accommodate a disabled competitor, or are the rules untouchable because any alteration of any rule would fundamentally alter the nature of the competitions?

Casey Martin is a disabled professional golfer. He can do everything well in the game of golf except walk to and from his shots. Because of a congenital deformity, his right leg is severely atrophied and weakened. He is placed at significant risk of fracturing his tibia by the simple act of walking, because of the increasing loss of bone stock and weakening of this bone that has occurred over the lifetime of this disorder. According to the medical testimony, walking also places Martin at significant risk of hemorrhaging as well, and creates an increased chance of developing deep venous thrombosis (blood clots).

The condition plaintiff suffers from causes him severe pain and discomfort. The slightest touching of his right leg at or below the knee is extremely painful. Beyond this, the condition causes him pain while playing golf, pain while carrying on daily activities and pain even while he is at rest.

A video of plaintiff's condition introduced into evidence at the trial, provides compelling evidence of the nature and extent of his disability:[1] The right leg appears to be

---

1. Defendant PGA Tour objected to the introduction of the video on grounds of relevance and hearsay. The objection as to relevance was based on the PGA's position that it conceded Martin has a disability and this evidence on that issue was unnecessary. However, as I will ex-

about half the size of plaintiff's left leg. When plaintiff removes his double set of support stockings and stands upright, the leg immediately discolors and swells in size because the circulatory condition with which he is afflicted prevents the blood from flowing through his veins back to the heart. Instead, gravity, combined with "incompetent" valves which fail to close properly, pulls the blood back down his leg. The leg becomes engorged in blood because the arteries pump blood to his leg but the veins fail to circulate blood back to the heart. To relieve this situation, plaintiff must lie down and elevate the leg.

A double set of support or compression stockings provides plaintiff with enough venous pressure to allow him to remain upright for periods of time. As he has gotten older (he is now 25 years of age), his leg has steadily worsened because of his disability. Whereas he used to be able to walk a golf course (albeit with difficulty), he can no longer do so. As noted, he is at substantial risk of serious physical harm by the mere act of walking.

Dr. Donald Jones, plaintiff's treating physician, counsels that it is medically necessary for Casey Martin to be permitted a cart if he is to play the game of golf. As he summarized plaintiff's condition:

[T]he medical records reflect a 25–year old male with a rare congenital vascular malformation of the right lower extremity which has led to, number one, chronic pain secondary to vascular engorgement and progressive loss of bone stock, pain so severe that he has at least considered to explore the use of time contingent narcotics; number two, a documented sleep disorder secondary to chronic pain which leads, according to Dr. Holmes, to an exhaustion syndrome; number three, the need to wear two compression stockings at all times; number four, it has resulted in marked muscular atrophy and weakness in his right calf; number five, it has affected his knee through multiple intra-articular bleeds, causing abnormalities which are

painful; and number six, and most important from the orthopedic aspect, it has resulted in a weakened tibia which is at risk for fracture and potential limb loss and/or serious post-fracture complications.

Transcript (# ) at pp. 99–100.

Defendant PGA Tour does not contest that plaintiff has a disability within the meaning of the ADA, nor does it contest that his disability prevents him from walking the course during a round of golf. However, prior to this trial, defendant did not review plaintiff's medical records nor view the videotaped presentation of his condition. The PGA's position in this case has been twofold:

First, it asserts that the ADA does not apply to its professional golf tournaments; and

Second, the PGA asserts that the requirement of walking is a substantive rule of its competition and that a waiver of the rule would, accordingly, result in a fundamental alteration of its competitions, which the ADA does not require.

The first defense raised by the PGA—that the ADA is inapplicable to its tournaments—has been extensively discussed in this court's order dated January 30, 1998(# 69), wherein I found that the PGA Tour was not exempt, as a "private club," from ADA coverage and also found that its tournaments were conducted at places—i.e., golf courses—that were specifically included within the definition of places of "public accommodation" subject to the ADA.

The second defense encompasses the concept that the ADA does not require a covered entity to work a fundamental alteration of the nature of its business or programs in order to accommodate the disabled, nor need the entity accommodate if to do so would result in an undue hardship to the entity.

A few examples suffice to illustrate this point: Suppose a bookstore normally does not stock books in braille. A blind customer demands the accommodation of a supply of

plain more fully *infra*, I disagree with the PGA's contention that an individualized assessment of Casey Martin's disability is irrelevant to the outcome of this case. Consideration of the nature and extent of plaintiff's disability is critical to determining whether use of a cart affords him a *reasonable* accommodation under the circumstances presented. The hearsay objection concerned certain audio portions of the tape, which portions were stricken from the record.

such books. The bookstore need not comply with the request, as such an accommodation would fundamentally alter the nature of its business. *See* 28 C.F.R. Ch. 1 Pt. 36, App. B at p. 632 (July 1, 1997 edition).[2] Or, to use another example cited by the PGA, a day care center normally does not provide individualized care (i.e., one attendant for each child) to its customers. A disabled child, in need of individualized attention, requests such an accommodation. The day care center need not comply because such would fundamentally alter the nature of the service the center provides.

There are few reported cases wherein the ADA has been applied to sports programs:

The Sixth Circuit Court of Appeals applied the ADA to the Michigan High School Athletic Association on two separate occasions regarding eligibility requirements. In *McPherson v. MHSAA*, 119 F.3d 453 (6th Cir.1997) the court considered whether the MHSAA's eight semester rule[3] violated the ADA when applied to a student with a learning disability which prevented him from completing high school in eight semesters. The court initially noted that the simple fact that the MHSAA labeled the rule necessary did not make it so, but that the court had an independent responsibility to determine whether the rule is in fact necessary. *Id.* at 461. The court determined the rule was necessary.[4] The court then found that requiring the MHSAA to waive the rule would work a fundamental alteration in its sports programs and would impose an immense financial and administrative burden on the MHSAA by forcing it to make "near impossible determinations" about a particular student's physical and athletic maturity.

Two years prior the court similarly found that waiver of an age regulation in high school sports fundamentally altered the program. *See Sandison v. MHSAA*, 64 F.3d 1026 (6th Cir.1995). The court noted, as it did in *McPherson*, that individually determining whether each older student possessed an unfair competitive advantage was not a reasonable accommodation. *Id.* at 1037.

The Eighth Circuit was confronted with a similar age eligibility rule of the Missouri State High School Athletic Association. *See Pottgen v. MSHSAA*, 40 F.3d 926 (8th Cir. 1994). In *Pottgen* the court found that the age requirement was essential to the high school athletic program and that an individualized inquiry into the necessity of the requirement in the plaintiff's case was inappropriate. *Id.* at 930.[5]

The District Court for the District of New Jersey found that complete abandonment of the "core course" requirement would fundamentally alter the nature of NCAA athletic programs. *Bowers v. National Collegiate Athletic Assoc.*, 974 F.Supp. 459 (D.N.J. 1997). The *Bowers* court found the "core course" requirement essential because it was reasonably necessary to accomplish the purpose of the NCAA program. However, the court also noted that the rule authorized waiver of the requirement on a case-by-case basis for individualized consideration and as such was adequate to reasonably accommo-

---

2. If the disabled person were an employee of the bookstore, however, and required a braille-encoded computer to perform her tasks, a different analysis would be applied and the question would be whether the accommodation would be an undue hardship (e.g., too great a financial burden) on the employer. *See* 42 U.S.C. §§ 12112(b)(5)(A), 12111(10). Because I find that Casey Martin is not an employee of the PGA Tour (*infra*), I focus only on the issue of whether he is entitled to his requested accommodation (the use of a golf cart) as an independent contractor playing in defendant's tournaments which are held at places of public accommodation.

3. The MHSAA's eight semester rule provided that any student who has completed eight semesters of high school is ineligible for interscholastic sports competition.

4. The purpose of the rule was to limit the level of athletic experience and range of skills of the players in order to create a more even playing field for the competitors, to limit the size and physical maturity of high school athletes for the safety of all participants, and to afford the players who observe the rule a fair opportunity to compete for playing time.

5. Plaintiff cites two district court cases in which an individualized inquiry was conducted to determine whether waiving the age rule for the individual plaintiffs would undermine the purpose of the rule, but each was vacated as moot. *See Johnson v. Florida High School Activities Assoc.*, 899 F.Supp. 579 (M.D.Fla.1995), *vacated as moot* 102 F.3d 1172 (11th Cir.1997); *Dennin v. Conn. Interscholastic Athletic Conference*, 913 F.Supp. 663 (D.Conn.1996), *vacated as moot* 94 F.3d 96 (2nd Cir.1996).

date students with learning disabilities. *Id.* at 467.

From this rather limited background of athletic ADA case law, the PGA asserts that the court should focus on whether an athletic rule is "substantive"—i.e., a rule which defines who is eligible to compete or a rule which governs how the game is played. If it is, according to the PGA's argument, the rule cannot be modified without working a fundamental alteration of the competition, and the ADA consequently does not require any modification to accommodate the disabled.

I note, however, that even in those cases most heavily relied upon by the PGA the courts examined the purpose of each of the rules in question to determine if the requested modification was reasonable.

In *Sandison* and *McPherson,* the eligibility requirements imposed were closely fitted with the purpose of high school athletics—to allow students of the same age group to compete against each other. The learning-disabled plaintiffs who had passed beyond the age or semester limits while still remaining in high school could not compete without fundamentally altering the nature of the services at issue. That the plaintiffs in those cases may have been less skilled athletes than their peers missed the point. High school athletics are for youths of a certain age group (14–18). Eliminating the curriculum or age-eligibility requirements for high school athletes clearly changes the fundamental nature of such competition.

Similarly, in *Bowers,* the issue was the "core course" requirement for student-athletes at the collegiate level. An athlete had to be a qualified *student* to compete A complete waiver of the academic requirement would obviously alter the fundamental nature of the program, and, as noted, individual assessments and exemptions were permitted.

That is not to say that athletic associations have unfettered discretion to set eligibility requirements as they see fit. May a high school athletic association expressly define eligibility requirements so as to exclude the learning or other disabled? If it did, would the courts simply be left to conclude that any change in such a rule would fundamentally alter the rules of competition and by virtue of such be unreasonable? For example, may a high school league promulgate a rule prohibiting competitors from using corrective lenses to assist their vision at athletic events— and be immune from ADA scrutiny because an accommodation to the sight-impaired would fundamentally alter a rule of competition?

Essentially, then, the PGA Tour's contention that it alone may set the rules of competition, and that any modification of any of its rules (which may be necessary to accommodate the disabled) fundamentally alters the nature of PGA tournaments, is simply another version of its argument that the PGA Tour is exempt from the provisions of the ADA. It is not. The court has the independent duty to inquire into the purpose of the rule at issue, and to ascertain whether there can be a reasonable modification made to accommodate plaintiff without frustrating the purpose of the rule, and without altering the fundamental nature of PGA Tour competition.

Although the PGA Tour is a professional sports organization and professional sports enjoys certainly, a much higher profile and display of skills than collegiate or other lower levels of competitive sports, the analysis of the issues does not change from one level to the next. High school athletic associations have just as much interest in the equal application of their rules and the integrity of their games as do professionals. Put differently, if it is unreasonable to accommodate Casey Martin's disability with a cart at the PGA Tour level because of its rules of competition, it is equally unreasonable to so accommodate a similarly disabled golfer at the high school level if the same rules were applicable.

■ It is also worth noting that the ADA does not distinguish between sports organizations and other entities when it comes to applying the ADA to a specific situation. Businesses and schools have rules governing their operations which are of equal importance (in their sphere) as the rules of sporting events. Conversely, the disabled have just as much interest in being free from discrimination in the athletic world as they do in other aspects of everyday life. The key questions are the same: does the ADA apply, and may a *reasonable* modification be made to accommodate a disabled individual?

An example from a prior case filing illustrates the tension that exists between the disabled seeking equal access and an entity that must modify its rules or practices to accommodate: A man afflicted with cerebral palsy books an international flight on a commercial airline from Oregon to Germany. The first leg of the flight takes the disabled individual from Eugene, Oregon to Chicago, Illinois, where he changes planes for the next leg of the trip. The captain of the airlines for the international leg, however, decides that the individual's condition (which hasn't changed since the first flight) renders him unfit to travel safely, and so he orders him off the plane. This unfortunate person's journey is interrupted solely because of his disability, and he is relegated to languish in a hotel room (away from his home and away from his destination) until a captain can be found who is willing to admit him as a passenger.[6]

The rule at stake in the above example is the age-old rule that the captain is in charge of the ship. This rule has an obvious and important substantive purpose. Nonetheless, are the disabled not entitled to travel to their destinations with the same degree of reliance on their arrangements as the able-bodied? Put differently, doesn't the ADA (or its counterpart, the Rehabilitation Act) require the airlines to modify the rule to provide a reasonable accommodation—i.e., a flight there and back without interruption by an uncomfortable captain—under the specific circumstances of his case, even though such might modify a substantive rule of its operation?

 It is with these concepts in mind that I approach Casey Martin's request for an accommodation.

First, I set forth (and perhaps restate to some extent), a general overview of the ADA. As I reject (without detailed elaboration[7]) plaintiff's claims that he is a PGA Tour employee and that the Nike Tour is a "course or examination" under the Act, I will discuss only his remaining claim, i.e., the "public

accommodation claim" under Title III of the Act.

Title III of the ADA provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.

. . . .

discrimination includes failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

. . . .

discrimination also includes the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered.

42 U.S.C. §§ 12182(a), 12182(b)(2)(A)(i) and (ii)

The ADA was enacted by Congress in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Congress found that "individuals with disabilities continually encounter various forms of discrimination, including ... failure to make modifications to existing facilities and practices...." Congress intended to protect disabled persons not just from intentional discrimination but also from "thoughtlessness,"

---

6. *See* Civil Number 93–6068–TC.

7. For the most part, I agree with, and incorporate by reference, the argument set forth by de-

fendant in its memorandum in support of summary judgment regarding the employee, and course and exam issues. *See* Defendant's Memo (# 21).

"indifference," and "benign neglect." *See Crowder v. Kitagawa,* 81 F.3d 1480, 1483–1484 (9th Cir.1996).

ADA defines disability with respect to an individual as:

 (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

 (B) a record of such impairment; or

 (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

The phrase physical or mental impairment means:

 (i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine; or

 (ii) Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

28 C.F.R. § 36.104(1).

The phrase major life activity means:

functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

28 C.F.R. § 36.104(2).

The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

 1. the nature and severity of the impairment;

 2. the duration or expected of the impairment; and

 3. the permanent or long term impact, or the expected permanent or long term

impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).[8]

■ Temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, etc. *Sanders v. Arneson Products,* 91 F.3d 1351, 1354 (9th Cir.1996). Temporary injury with minimal residual effects cannot be the basis for a sustainable claim under the ADA. *Id.*

■ Plaintiff has the burden of demonstrating that he is disabled and has done so. Plaintiff also has the burden of proving that a modification was requested and that the requested modification is reasonable. "Plaintiff meets this burden by introducing evidence that the requested modification is reasonable in the general sense, that is, in the general run of the cases." *Johnson v. Gambrinus Co.,* 116 F.3d 1052, 1059 (5th Cir. 1997). With respect to this element, the use of a cart is certainly not unreasonable in the game of golf. As noted hereafter, the Rules of Golf do not require walking, and even the PGA Tour permits cart use at two of the four types of tournaments it stages.[9] While the PGA Tour permits cart use at those two events, it imposes no handicap system or stroke penalties on those who opt for carts as opposed to those who elect to walk. This is certainly compelling evidence that even the PGA Tour does not consider walking to be a significant contributor to the skill of shotmaking. In addition, the NCAA and PAC 10 athletic conference permit the use of carts as an accommodation to disabled collegiate golfers. Under the *Johnson* analysis such evidence meets plaintiff's burden of demonstrating that a cart is a reasonable modification to accommodate his disability in the game of golf in the general sense, that is in the general run of cases.

---

**8.** The regulations concerning temporary impairments are found in the section concerning Title I (employment) of the ADA, but are useful in determining whether a disability exists under Title III.

**9.** The PGA Tour stages the PGA Tour, senior PGA Tour, the Nike Tour, and the Qualifying School Tournament. The Senior Tour is for PGA Tour

golfers of 50+ years in age. The Qualifying School Tournament screens those who are competing for entry into the PGA Tour and Nike Tour. The PGA Tour admits the most skilled golfers; the Nike Tour admits those at the next highest level. The PGA Tour allows cart use on the Senior PGA Tour and in the two preliminary rounds of the Qualifying School Tournament.

Defendant then must make the requested modification unless it meets its burden of proving that the requested modification would fundamentally alter the nature of its public accommodation. "The type of evidence that satisfies this burden focuses on the specifics of the plaintiff's or defendant's circumstances and not on the general nature of the accommodation." *Id.* Defendant argues that an individualized inquiry into the necessity of the walking rule in Casey Martin's case is not appropriate. *See e.g., Pottgen,* 40 F.3d at 930–31. However, *Johnson* suggests otherwise. An individualized assessment finds support in the Ninth Circuit as well. *See Crowder,* 81 F.3d at 1486 ("the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry"); *See also, Stillwell v. Kansas City, Missouri Bd. of Police Commissioners,* 872 F.Supp. 682, 687 (W.D.Mo. 1995) (individualized assessment necessary to determine if plaintiff can meet the purpose of defendant's rule). Thus, the ultimate question in this case is whether allowing plaintiff, given his individual circumstances, the requested modification would fundamentally alter PGA and Nike Tour golf competitions.[10]

*The Rules of Golf*

The general "Rules of Golf" are promulgated by the United States Golf Association (USGA) and the Royal and Ancient Golf Club of St. Andrews, Scotland (R & A).

Rule 1–1 provides as follows:
The Game of Golf consists in playing a ball from the *teeing ground* into the hole by a *stroke* or successive strokes in accordance with the rules.

Nothing in the Rules of Golf requires or defines walking as part of the game. In its reported *Decisions on the Rules of Golf* regarding the Rules of Golf, the USGA has expressed that it is permissible to ride a cart in golf unless such is prohibited by the local rules defining the conditions of competition for particular events. In Appendix I to the Rules of Golf we find:

**Transportation**

If it is desired to require players to walk in a competition, the following condition is suggested:
Players shall walk at all times during a stipulated round.

The PGA Tour promulgates a pamphlet entitled "Conditions of Competition and Local Rules" which govern PGA Tour and Nike Tour tournaments. The preamble to this document provides, in pertinent part, as follows:

The Rules of the United States Golf Association govern play, as modified by the PGA Tour.

One of those modifications appears in Section A—Conditions of Competition:

¶ 6 *Transportation—Appendix I*
Players shall walk at all times during a stipulated round unless permitted to ride by the PGA Tour Rules Committee.

No written policy has been cited by either party which governs the Rules Committee in its exercise of discretion regarding a waiver of the walking requirement. On the occasions when the walking rule has been waived, it has been waived for all competitors (e.g., to shuttle players from the 9th green to the 10th tee where considerable distance is involved). No waiver has ever been granted for individualized circumstances (such as disability).

Prior to requesting use of a cart as an accommodation for his disability, plaintiff explored the possibility of various artificial aids to walking. I allow Dr. Jones to describe what those were, and why they won't work:

By August 1996 at the age of 24, Casey reported to me that he was having tremendous difficulty with ambulation. He was having great difficulty walking 18 holes of golf. He was not only having trouble with the golf, but was also now having significant discomfort with the requirements of daily living. At this point I immobilized his leg in a removable brace and started a physical therapy program. Neither was beneficial.

---

10. At this stage of the analysis, I agree with the PGA that only the nature of PGA and Nike Tour golf may be considered in determining whether the requested modification would cause a fundamental alteration. However, as noted, I do not agree with defendant's position that this analysis is to be undertaken without an individualized assessment of Casey Martin's disability.

By now Casey was becoming extremely frustrated, so I decided to accompany him during a number of rounds during the summer of 1996.

Q. You are talking about rounds of golf?

A. Rounds of golf.

Q. Okay.

A. In hopes that I could observe some characteristics of his gait that would allow me to provide him with some form of stabilizing device. During this time, we tried in—shoe orthosis; that is, shoe inserts, which were of minimal benefit.

Q. What were they intended to do?

A. They will stabilize the hindfoot, and there's a biomechanical region whereas if you stabilize the hindfoot, the tibia doesn't rotate with the gait and will hopefully decrease the pain.

Q. The right leg is slightly longer also?

A. Yes.

Q. Okay. And that right leg being longer, is due to this condition?

A. Yes.

Q. Okay. All right. What was next?

A. We also placed him into ankle-foot orthosis. Now, that's a plastic brace that extended from the toes to the mid-calf and is for the purpose of stabilizing his hindfoot and, also, protecting his tibia. Casey found that it was virtually impossible to golf in this device because it limited his hindfoot motion as well as the fact that it caused considerable discomfort over his calf which is very sensitive. It was during this time that I became increasingly concerned about the well being of Casey's lower extremity. I can recall playing two rounds of Golf with Casey where he was unable to finish the 18 holes while walking. I also recall this summer one round of golf where we used a golf cart. The ground was moderately wet and unstable. We could not park as close to the tee box or to the green as we normally would. As a result, Casey, had to stop his round at about the 14th hole because he was having difficulty just getting to the tee box and green.

Transcript (# ) at pp. 88–90.

Thus, Casey Martin cannot walk the course, and only a cart will permit him to compete on the Nike Tour. As with the disabled airline passenger, he finds himself in conflict with a substantive rule of operation.

■ According to the PGA Tour, the purpose of the walking rule is to inject the element of fatigue into the skill of shot-making. I accept that assertion and expressly find from the evidence produced at trial that such is a cognizable purpose[11] of the rule from the standpoint of the ADA.

The question thus is—may the walking rule be modified to accommodate Casey Martin without fundamentally altering the nature of the game being played at the PEA Tour's tournaments?

In answering the question, as noted previously, I reject the defendant's contention that the plaintiff's individual circumstances are irrelevant to the inquiry. See *Johnson, Crowder, Stillwell,* cited *supra* p. 1249.

Furthermore, the fatigue factor injected into the game of golf by walking the course cannot be deemed significant under normal circumstances. Dr. Gary Klug, a professor in physiology at the University of Oregon, and an expert on the physiological basis for fatigue, calculates that approximately 500 calories are expended in walking a course of golf (approximately 5 miles of walking in a 5 hour time period). He describes the energy expenditure as follows: "nutritionally it's less than a Big Mac." He further notes that these calories are expended over a 5 hour period, and that the golfers have numerous intervals of rest and opportunities for refreshment (or calorie replacement).

While the PGA Tour cited Ken Venturi's memorable 1964 U.S. Open win in which he overcame severe and near-fatal exhaustion as he finished the course in high heat and humidity, Dr. Klug indicates that Mr. Venturi's fatigue was induced by heat exhaustion and fluid loss—not walking. According to Dr. Klug, tests have disclosed that fatigue from exercise—as measured by oxygen consumption—is not significantly influenced by heat or humidity. Rather, dehydration is the critical factor in such situations. Many spectators at the 1964 U.S. Open had to be treated

---

**11.** Mere tradition would not be a *cognizable* purpose—i.e., one entitled to any weight.

for exhaustion as well, and they were not walking.

Furthermore, fatigue at lower intensity exercise [12] is primarily a psychological phenomenon, according to Dr. Klug. Stress and motivation are the key ingredients here. Place an individual in the middle of the Los Angeles freeway at rush hour, and he will get fatigued in a hurry without moving a muscle. If someone pedals a bicycle for 30 minutes and says "I've had it," but is promised $1,000 if he goes another 5 minutes, his fatigue may well disappear.

Every individual differs in their psychological fatigue components, but walking has little to do with such components. If anything, from the evidence introduced at trial, most PGA Tour golfers appear to prefer walking as a way of dealing with the psychological factors of fatigue.[13] When given the option of cart-riding or walking—such as at the Senior PGA Tour or PGA Tour Qualifying Tournament—the vast majority have opted to walk. Why would this be if walking truly fatigued them so that they hit worse shots than if they ride? As the saying goes, "the proof of the pudding is in the eating."

And then we come to Casey Martin's unique circumstances. If the majority of able-bodied elect to walk in "carts optional" tournaments, how can anyone perceive that plaintiff has a competitive advantage by using a cart given his condition?

The fatigue plaintiff endures just from coping with his disability is undeniably greater than the fatigue injected into tournament play on the able-bodied by the requirement that they walk from shot to shot. Walking at a slow pace [14]—to the able-bodied—is a natural act, of little more difficulty than breathing. It is how we were designed to move from place to place.

Walking for Casey Martin is a different story.

In the first place, he does walk while on the course—even with a cart, he must move from cart to shot and back to the cart. In essence, he still must walk approximately 25% of the course. On a course roughly five miles in length, Martin will walk 1 1/4 miles.

The plaintiff is in significant pain when he walks, and even when he is getting in and out of the cart. With each step, he is at a risk of fracturing his tibia and hemorrhaging. The

12. Walking 5 miles in 5 hours cannot be equated with high intensity exercise. A requirement of running, or even walking, 5 miles at a continuous gait would certainly induce more fatigue from the physiological standpoint, but that is not what the PGA Tour requires. To quote from Nike Tour golfer Eric Johnson:

Q. ... does [walking] create any problem for you?
A. Not more than the temperature outside would cause a person to sweat just standing there or cause a person to be very cold just standing there. There are—there are cases and instances where we play golf courses that are hilly where you might have to walk up a hill, and you would be more exerted when you get to the top of the hill than if you were walking a flat surface or downhill. But because of the pace of play and our preshot routines, we know to not to hit when we are winded or we know not to hit until we are ready to hit the golf ball. So I can't think of a time in my golfing career where I've ever hit a golf shot where I've felt that I wasn't ready to hit.
Transcript (#) at p. 33.

13. As Nike Tour pro Eric Johnson described when asked why he preferred to walk:

I prefer to walk, probably for a number of reasons. One, it's how I've played golf most of my life, and it keeps me in rhythm. There are

times when I would prefer to walk because the temperature outside is such that if you are in the golf cart, the wind chill factor drops when you are riding in it and you are too cold. Weather's a real large contributing factor in walking. I would much rather walk if it was raining because I am able to stay under my umbrella and not get as wet, my equipment stays dry, those types of things.
Q. All right. Are you better able to get the feel of the course when you walk as opposed to ride, or do you know?
A. You get a full effect of the elements. Everything from changes in wind direction from one part of the fairway to the other, to being able to watch what the flag stick's doing on the green, to walking down the fairway versus being in the golf cart trying not to run somebody over.
Transcript (#) at p. 17.

14. The PGA Tour does not require golfers to walk rapidly to their next shot. There do not appear to be any time limits on getting to the ball, although a golfer has 5 minutes to find a lost ball. Once at the ball, a golfer has 40 seconds to hit it. If a golfer is closest to the hole, he has additional time to rest while the other members of his group hit their shots.

other golfers have to endure the psychological stress of competition as part of their fatigue; Martin has the same stress plus the added stress of pain and risk of serious injury. As he put it, he would gladly trade the cart for a good leg. To perceive that the cart puts him—with his condition—at a competitive advantage is a gross distortion of reality.

As plaintiff easily endures greater fatigue even with a cart than his able-bodied competitors do by walking, it does not fundamentally alter the nature of the PGA Tour's game to accommodate him with a cart.

It lends emphasis to the point that the walking rule may be modified without fundamentally altering the PGA's game to consider several other PGA rules in a hypothetical context.

Rule 6–4 of the Rules of Golf specifies:
**Caddie**

The player may have only one *caddie* at any one time, *under penalty of disqualification.*

Rule 8 provides:
**Advice; Indicating Line of Play Definitions**

"Advice" is any counsel or suggestion which could influence a player in determining his play, the choice of a club or the method of making a *stroke.*

Information on the Rules or on matters of public information, such as the position of hazards or the flagstick on the putting green, is not advice.

The "line of play" is the direction which the player wishes his ball to take after a stroke, plus a reasonable distance on either side of the intended direction. The line of play extends vertically upwards from the ground, but does not extend beyond the hole.

And Rule 8–1 states:
**Advice**

During a *stipulated round,* a player shall not give *advice* to anyone in the competition except his partner. A player may ask for advice during a stipulated round from only his partner or either of their caddies.

May these be modified to accommodate a disabled golfer—e.g., a blind golfer?

Interestingly, the USGA promulgates a pamphlet entitled *A Modification of the Rules of Golf for Golfers with Disabilities.* The Preface to the Pamphlet reads:

This publication contains permissible modifications to the Rules of Golf for use by disabled golfers. This is not intended to be a revision of the Rules of Golf as they apply to able-bodied players. As is the case for the Rules of Golf themselves, these modifications, along with the philosophy expressed herein, have been agreed upon by the United States Golf Association and the Royal and Ancient Golf Club of St. Andrews, Scotland.

Under the category of Blind Golfers, the pamphlet provides:

### Definition of "Coach"

The status of the coach and the duties which he may perform should be defined clearly. Without such clarification, it would be difficult, for example, to determine how a blind golfer must proceed if his ball were to strike his or another player's coach after a stroke. Therefore, the following definition is recommended:

**Coach**

A "coach" is one who assists a blind golfer in addressing the ball and with the alignment prior to the stroke. A coach has the same status under the rules as a caddie.

*Note:* A player may ask for and receive advice from his coach.

And the Caddie and Advice rules are modified as follows:

### Rule 6–4 (Caddie)

There is nothing in the rules which would prohibit the coach of a blind golfer from functioning as his caddie. For a variety of reasons, however, a coach may not be able to perform the duties of a caddie. Therefore, it is permissible for a blind golfer to have both a coach and a caddie. In such circumstances, however, the coach may not carry or handle the player's clubs except in helping the player take his stance or him as permitted by analogy to Decision 6–4/4.5. Otherwise, the player would be subject to disqualification for having more than one caddie.

**Rule 8–1 (Advice)**

In view of the Definition of "Coach," it is recommended that Rule 8–1 be modified as follows:

**8–1. Advice**

During a *stipulated round*, a player shall not give *advice* to anyone in the competition except his partner. A player may ask for advice during a stipulated round from only his partner, either of their caddies or, if applicable, their coaches.

Judy Bell, a former president of the USGA, testified that the *Golfers with Disabilities* pamphlet was not meant for the PGA Tour, but only for recreational golfers. While that may be, it begs the question of how the PGA Tour would handle the request of a blind pro golfer to have a coach in addition to a caddie. At oral argument, the attorney for the Tour was asked whether Rules 6–4 and 8–1 could be modified without fundamentally altering the nature of the PGA's competition. To quote from the colloquy:

THE COURT: How about the caddie and the coach for the blind golfer, as the pamphlet describes?

MR. MALEDON: Your Honor, my answer would be the same. As long as it does not fundamentally alter the nature of the competition, there's not a problem with it. But again, You Honor, you'd have know the facts. You'd have to look at the purpose for the rule. And I submit to you, Your Honor, that engaging in those kinds of analogies do not advance the ball in terms of what we are talking about here.

THE COURT: If I look at whether the purpose of the walking rule is to enhance competition by injecting fatigue into the equation, do I look at what Mr. Martin's disability does to him specifically insofar as inducing fatigue?

MR. MALEDON: No, Your Honor Absolutely not.

The paradox presented in the PGA Tour's position is readily apparent. A modification of the "one caddie only" rule to accommodate a blind golfer by providing him with a coach does not become the "reasonable" thing to do unless the PGA first conducts an individualized assessment of the golfer's disability— i.e., the PGA Tour must first recognize that he is blind, and then consider whether providing him a coach under his circumstances would give him a competitive advantage over the other golfers who aren't blind and thus don't need a coach. Yet in Casey Martin's situation, the PGA Tour adamantly refuses to assess the requested modification in light of the specifics of his disability. Inconsistently, it insists in this case that any modification of any of its rules would fundamentally alter the nature of its competition.

The rules, as demonstrated, are not so sacrosanct. The requested accommodation of a cart is eminently reasonable in light of Casey Martin's disability.

SO ORDERED.