**Ford OLINGER, Plaintiff,**

v.

**UNITED STATES GOLF ASSOCIATION, Defendant.**

**No. 3:98–CV–252RM.**

United States District Court, N.D. Indiana, South Bend Division.

May 20, 1999.

Thomas R. Lemon, William Douglas Lemon, Lemon Armey Hearn and Leininger, Warsaw, IN, John C. Hamilton, Hamilton Law Firm, South Bend, IN, for Ford Olinger, plaintiff.

Edward A. Sullivan, III, Baker and Daniels, South Bend, IN, Steven L. Jackson, Baker and Daniels, Fort Wayne, IN, Barry A. White, Lee N. Abrams, Guy G. Ward, Mayer Brown and Platt, Chicago, IL, for U.S. Golf Association, defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

A professional golfer whose physical condition prevents him from playing a full round of golf on foot seeks an order allowing him to use a golf cart to qualify for and compete in the United States Open golf tournament. The Americans with Disabilities Act does not require accommodation for a disabled individual when the accommodation would fundamentally alter the nature of the activity. The tournament operator has persuaded the court that allowing the use of a golf cart would fundamentally alter the nature of this particular tournament, either by eliminating the uniformity of rules common to athletic events, or by changing the importance of a competitor's response to fatigue.

### I

Ford Olinger is a disabled individual within the meaning of the Americans Disabilities Act. Mr. Olinger wants to compete in the United States Open Championship, a tournament conducted by the defendant United States Golf Association ("USGA"), and advance to the championship rounds. As a professional golfer, he is eligible to apply to compete in the local qualifying for that championship.

The U.S. Open is one of thirteen national championships the USGA conducts each year. Criteria for entry and tournament format vary with the event. The tournament at issue here, the U.S. Open, consists of four rounds of golf that usually are played on four consecutive days, but occasionally require more than one round in a single day. The golfer with the fewest strokes over 72 holes (or any required playoff) is declared the national golf champion by the USGA and is awarded prize money. The U.S. Open field in the championship is limited to 156 golfers. Objective, published criteria (which are meant to ensure that the world's pre-eminent golfers need not prove their abilities anew) exempt about 37% of the eventual field from preliminary qualifying. A two-step preliminary process—local qualifying and sectional qualifying—determines the non-exempt spots in the U.S. Open.

The USGA requires that a participant in the local qualifying round carry a certified handicap index of 1.4 or better for amateurs, or status as a professional (professionals do not carry handicaps). 7,117 golfers (including those exempted from qualifying) were accepted to compete in the 1998 U.S. Open. In 1998, local qualifying was conducted with an 18–hole round at each of 90 sites. 750 of the 6,881 competitors in the local qualifying advanced to sectional qualifying, which consists of 36 holes in a single day and is conducted at twelve sites across the nation. The USGA holds the U.S. Open Championship and the local and sectional qualifying rounds for the Championship at different sites every year, and occupies each site for a limited time before, during, and after the subject events. A little over 95% of the

103 courses used in 1998 for the U.S. Open championship and qualifying rounds were private clubs. The USGA oversees the competition and leased the Olympic Club for the 1998 U.S. Open Championship.

Mr. Olinger wants to play in the May 24, 1999 local qualifying at the South Bend Country Club, but the USGA forbids the use of carts by participants in the U.S. Open and its qualifying rounds, and Mr. Olinger can no longer walk the course while playing a round of golf. Mr. Olinger participated in the 1998 local qualifying round with the use of a cart pursuant to a temporary restraining order from this court.[1] He shot 83 at the local qualifying round, which placed him 63rd out of 75 competitors, and so did not advance to the sectional qualifying. The best score at the local qualifying in South Bend was 65.

Mr. Olinger's disability arises from bilateral avascular necrosis, which significantly impairs his ability to walk. He had surgery on his left hip in May 1997, and has deferred similar surgery on his right hip due to pain. The Social Security Administration has determined that Mr. Olinger is disabled within the meaning of regulations that govern Social Security payments—regulations that, it should be added, have nothing whatsoever to with the Americans with Disabilities Act. Mr. Olinger takes medication that reduces the pain, but which also impairs his lung capacity, dulls his senses, and causes fatigue. Were it not for his disability, Mr. Olinger would prefer to walk the course than to ride during the course of a competitive round; he believes that walking helps his rhythm, enhances his feel for the game and the competition, and improves his ability to identify the ground texture. When riding a cart, he must keep his mind on matters other than the next shot, which he feels is a disadvantage in comparison to the walking golfer. Notwithstanding this preference, Mr. Olinger's bilateral avascular necrosis makes it nearly impossible for him to walk an 18–hole golf course. He can complete 18 holes of golf only with the use of a golf cart.

The USGA is a private, not-for-profit association supported by some 750,000 individuals and chartered "for the purpose of promoting and conserving throughout the United States the best interests and the true spirit of the game of golf as embodied in its ancient and honorable traditions." The parties stipulate that while the USGA neither has nor claims any legal power or right with respect to the game of golf beyond the conduct of its own tournaments, the USGA is, by the golf community's common and voluntary consent, regarded as the governing body of golf within the United States. In addition to operating the U.S. Open and twelve other tournaments, the USGA produces the official rules of the game of golf.

Title III of the Americans with Disabilities Act was enacted to facilitate disabled individuals' access to places of public accommodation. Consistent with this goal, the Act states broadly: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Regulations define "place of public accommodation" as "a facility, operated by a private entity whose operations affect commerce and fall within

1. The court concluded that a temporary restraining order was appropriate under the standards applied in this circuit in recognition that: (1) exclusion from the local qualifying would have meant the Mr. Olinger could not participate in the 1998 championship even if he prevailed on his ADA claim before the championship began; (2) the restraining order would only apply to the local qualifying because it would expire before sectional qualifying; and (3) in light of a previous agreement between the USGA and professional golfer Casey Martin, Mr. Olinger would not be the only golfer to ride a cart in local qualifying.

at least one" of the categories set forth in § 12181(7):

(A) an inn, hotel, motel, or other place of lodging . . . ;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7). *See* 28 C.F.R. § 36.104 (1998).

## II

Mr. Olinger maintains that the USGA is a private entity that is a public accommodation or that owns, leases or operates a place of public accommodation as those terms are used in the ADA, 42 U.S.C. § 12181. The USGA sought summary judgment on several grounds. Because of a concern (that proved to be unfounded) that the case might have become moot, the court deferred ruling on the summary judgment motion until the final pretrial conference; at that conference, the court ruled against the USGA on several arguments. The summary judgment ruling was oral and brief, and the court believes it is appropriate to explain that ruling in greater detail. This portion of today's opinion explains that ruling. The reader should recall that the summary judgment ruling was based on a record different from the trial evidence. Part II of this opinion is based on the summary judgment record.

The USGA argued that the U.S. Open and other USGA championships are not "public" and so are not places of public accommodation under the ADA. Mr. Olinger noted that any amateur with the requisite handicap may play in the local qualifying, as may any golf professional, regardless of skill level. Mr. Olinger also argued that the popularity and record participation in the U.S. Open demonstrate that the USGA conducts the U.S. Open as a public accommodation.

■ It is unnecessary to decide if the U.S. Open is a "public" event or if the USGA conducts the U.S. Open as a public accommodation because the U.S. Open is not a "place of public accommodation." The ADA prohibits discrimination on the basis of disability by any person who owns, leases, or operates a place of public accommodation. *See* 42 U.S.C. § 12182. In the same way that "Congress could . . . have avoided the use of the word 'place' in subsection (b)(3)" of Title II of the Civil Rights Act of 1964, *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1273 (7th Cir. 1993), Congress could have avoided the use of the word "place" in Title III of the ADA. Congress chose to list places, not events or activities, as public accommodations. *See* 42 U.S.C. § 12181(7). An event or activity is not a public accommodation or a place of public accommodation within

the reach of Title III. Whether the U.S. Open is "public," the U.S. Open is not a "public accommodation" or a "place of public accommodation." The inquiry must focus on the place, not the event.

■ The USGA, a membership organization, argued that a membership organization with no close connection to a particular facility or location, and without affiliation with a place open to the public where membership in the organization is a predicate to the facility's use, is not a "place of public accommodation" within the meaning of Title III of the ADA. *See Welsh v. Boy Scouts of America*, 993 F.2d at 1270–1271 (rejecting the argument that "places of public accommodation" include membership organizations lacking a close connection to a specific facility); *Elitt v. U.S.A. Hockey*, 922 F.Supp. 217, 223 (E.D.Mo.1996) (local and national hockey associations did not constitute places of public accommodation). For Title III of the ADA to apply to the USGA, the USGA must be classified properly as an owner, lessor, lessee, or operator of a place of public accommodation. *See Welsh v. Boy Scouts of America*, 993 F.2d at 1273; *see also Ford v. Schering–Plough Corp.*, 145 F.3d 601, 612–613 (3d Cir.1998); *Stoutenborough v. National Football League*, 59 F.3d 580, 583 (6th Cir.1995); *Bowers v. National Collegiate Athletic Ass'n*, 9 F.Supp.2d 460, 483 (D.N.J.1998); *Tatum v. National Collegiate Athletic Ass'n*, 992 F.Supp. 1114, 1119 (E.D.Mo.1998); *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 959 F.Supp. 496, 499 (N.D.Ill.1997). The USGA, like the youth hockey league, the professional football league, and the Boy Scouts of America, is a membership organization and as such is not itself a place of public accommodation.

But Mr. Olinger does not seek admission to the USGA; he seeks equal access to the golf courses the USGA uses each year in May and June. The USGA argues that it lacks any close connection to a particular facility or location and that it does not own, lease, or operate a place of public accommodation.

Although the ADA does not define "operates," the preamble to the regulations promulgated under Title III specifies that the coverage of the "owns, leases (or leases to), or operates" language is "quite extensive" and includes operation, "even if the operation is only for a short time." 28 C.F.R. pt. 36, app. B at 591 (1998). For a day in May each year, the USGA, a private entity, operates 90 golf courses for the local qualifying rounds and 12 golf courses for the sectional qualifying rounds. The USGA restricts the normal operations of these courses by reserving the golf courses exclusively for the USGA entrants for the day and the time necessary to complete the qualifying rounds. The USGA supervises the play, provides the rules, officiates the play, sets up the golf course, and determines the groupings of players and their tee times.[2] USGA control over the host golf course for the championship is much more extensive and in 1998 consisted of a lease granting the USGA nearly four years of some form of control over the Olympic Club in San Francisco.[3] The

2. The USGA asserts that the Official in Charge, a volunteer typically from a state or regional local golf association that is independent of and separate from the USGA, has the authority to disqualify or remove a competitor and is responsible for all matters pertaining to spectators and other non-competitors in qualifying rounds. Although the Official in Charge is responsible for these aspects of the qualifying competitions, the USGA does not dispute that it supervises the play during the rounds of golf and determines who gets to play, what time they play, with whom they play. In the 1998 qualifying in South Bend, the Official in Charge was Mr. Bob Lee, a member of the USGA's Sectional Affairs Committee. At trial, the USGA asked Mr. Lee about "protocol" for handling disruptive contestants or spectators; that exchange did not, of course, affect the summary judgment ruling.

3. The control exercised by the USGA over the Olympic Club during the championship extended to nearly every aspect of the club

USGA exercises substantial control over the operations of the golf courses used in local and sectional qualifying rounds and the championship rounds. It operates the qualifying sites and leases and operates the championship site.

The USGA also argues that the area "inside the ropes" on a golf course during the U.S. Open—the part of the course in which the contestants hope to play the game—is not a place of public accommodation because it is off limits to the general public. The ADA specifies a "golf course or other place of exercise or recreation" as a category of public accommodation. 42 U.S.C. § 12181(7)(L). The USGA argues that because the U.S. Open is conducted to identify the national champion, the event is not conducted (and the golf course is not used) for exercise or recreation. The USGA contends that the area "inside the ropes" is more analogous to a place of exhibition or entertainment. *See* 42 U.S.C. § 12181(7)(C).

"Many facilities that are classified as public accommodations are open only to specific invitees." *Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698, 759 (D.Or.1997). A mixed use facility, consisting of an exempt facility of which a portion is a public accommodation, can also exist; the USGA cites the example of a general public tour of a private facility. *See* 28 C.F.R. pt. 36, app. B at 587 (1998). The regulations do not provide, however, for a private enclave in a public accommodation. *See Martin v. PGA Tour. Inc.*, 984 F.Supp. 1320, 1326–1327 (D.Or.1998).

■ This case is similar to a series of cases addressing the NCAA and its determination of eligibility of college athletes. *See Bowers v. National Collegiate Athletic Ass'n*, 9 F.Supp.2d 460 (D.N.J.1998) (football player with a learning disability); *Tatum v. National Collegiate Athletic Ass'n*, 992 F.Supp. 1114 (E.D.Mo.1998) (basketball player with a generalized anxi-

ety disorder and a specific phobia related to testing); *Ganden v. National Collegiate Athletic Ass'n*, No. 96C6953, 1996 WL 680000 (N.D.Ill. Nov. 21, 1996) (swimmer with a learning disability); *Butler v. National Collegiate Athletic Ass'n*, No. C96–1656D, 1996 WL 1058233 (W.D.Wash. 1996) (football player with a learning disability). In each of these cases, the NCAA denied eligibility to arguably elite athletes (they were recruited by Division I schools—Temple, Iowa, Michigan State, St. Louis University, University of Washington—and were offered scholarships for their athletic abilities) because of their disabilities. The courts found that the NCAA exercised enough control over the athletic facilities, as places of exercise and recreation as well as places of exhibition or entertainment, to make the NCAA an operator of the facilities. The athletes in these cases were the performers rather than the audience, just as the 6,881 golfers at the local qualifying events, the 750 golfers at the sectional qualifying events, and the 156 golfers at the championship were the performers. The courts in the NCAA cases did not find Title III limited by the roped-off, competitive portion of the field, court or pool, and nothing supports a finding that the USGA's barrier ropes limit Title III. The ADA applies to the areas of competition during the U.S. Open championship and qualifying rounds as well as to the gallery and the areas outside the ropes.

Finally (for purposes of explaining the summary judgment ruling), the USGA argues that organizers of championship-level competitions have the legal right to define the rules for that competition. Citing *New York Roadrunners Club v. State Division of Human Rights*, 55 N.Y.2d 122, 447 N.Y.S.2d 908, 432 N.E.2d 780, 781 (1982), which held that because the New York City Marathon is a footrace, its organizers had no obligation to allow other means of locomotion, the USGA argues that the organizer of a championship athletic compe-

operations except the snack bar operations in     the club and the club annex.

tition must have the right to define its event and the rules of its competition. Mr. Olinger responds that if the USGA is right on this point, sport becomes the only industry in America allowed to construct barriers to access that are unrelated to performance.

■ As another district court stated in a somewhat similar case, the USGA's contention that it alone may set the rules is simply another version of its argument that the USGA is exempt from the provisions of the ADA, "[a]nd it is not." *Martin v. PGA Tour, Inc.*, 994 F.Supp. 1242, 1246 (D.Or.1998).[4] Insofar as the USGA operates a place of public accommodation, it is subject to Title III of the ADA.

### III

■ The court found a genuine issue of material fact, and so denied the summary judgment motion, insofar as the USGA argued that the accommodation that Mr. Olinger requests would fundamentally change the nature of the activity. Following the trial conducted on May 17–18, the court finds itself in agreement with the USGA's argument.

As explained in the previous section, the USGA is a lessor of a public accommodation, is subject to the ADA, and cannot discriminate against a golfer on account of a golfer's disability. "Discrimination" under the ADA includes the failure of an owner, operator, lessee, or lessor of public accommodations "to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, [or] facilities ... to individuals with disabilities, unless the entity can demonstrate that making such modifications would funda-

mentally alter the nature of such goods, services, ... or accommodations...." 42 U.S.C. § 12182(b)(2)(A)(ii).

While the "fundamentally alter" concept originated in the Supreme Court's discussion of the reasonableness of an accommodation under the Rehabilitation Act in *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), "fundamentally alter" is now part of the statutory language of the ADA. *See* 42 U.S.C. § 12182(b)(2)(A)(ii).

Rehabilitation Act reasonable accommodations case analysis "is easily transferrable to the Title III[ADA] reasonable modifications context." *Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir.1997). Very similar language is found in both provisions. The Rehabilitation Act defines discrimination to include "not making reasonable accommodations ... unless [the defendant] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). The ADA defines discrimination to include "a failure to make reasonable modifications ... unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations...." 42 U.S.C. § 12182(b)(2)(A)(ii). The Rehabilitation Act provides an undue hardship defense; the ADA provides a fundamental alteration defense, with fundamental alteration merely a particular type of undue hardship. *See Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d at 1059; *see also* 29 C.F.R. pt. 1630, app. § 1630.2(p) (1998).

4. A word should be added about the *Martin* case, since today's ruling no doubt appears to conflict with that well-publicized holding. This court need not evaluate the *Martin* holding, first, because the decision of a district court in another circuit has no precedential impact on this court, and further, this case is different from the *Martin* case. First, this case focuses on a single event, not a series of multi-level weekly tournaments. Further, the parties in *Martin* presented different evidence, so the records differ. For example, the *Martin* court cited the testimony of Dr. Gary Klug with some frequency; this court granted the USGA's motion to exclude Dr. Klug's testimony for want of sufficient showing of reliability of underlying scientific principles.

934

■ An ADA plaintiff bears the burden of proving that the requested modification is reasonable in the general sense. *See Johnson v. Gambrinus Company/Spoetzl Brewery,* 116 F.3d at 1059; *Crowder v. Kitagawa,* 81 F.3d 1480, 1486 (9th Cir. 1996); *Staron v. McDonald's Corp.,* 51 F.3d 353, 356 (2d Cir.1995). The USGA does not appear to challenge the reasonableness of Mr. Olinger's requested accommodation in a general sense, and the golf cart has become so ubiquitous in the sport that any such challenge would seem doomed.

The game of golf does not forbid the use of golf carts. The Rules of Golf, prepared by the USGA, acknowledge the potential involvement of golf carts: Section 1 ("Etiquette") exhorts the golfer to observe strictly local notices regulating the movement of carts; Section II ("Definitions") defines a golf cart and everything in it as the equipment of a player involved in its movement, and Rule 19 echoes that definition. The Rules of Golf recognize that a particular event or a particular course condition may require rules in addition to the generally applicable rules, so Rule 33 empowers a committee to make local rules, and Appendix I sets forth topics on which local rules might be advisable. One of those suggested rules relates to "Transportation," and provides, "If it is desired to require players to walk in a competition, the following condition is suggested: Players shall walk at all times during a stipulated round." The Appendix proposes a penalty of two strokes per hole, to a maximum of four strokes per round, and disqualification if the offending player does not discontinue the unauthorized form of transportation immediately. Again, however, this is not a rule of golf; it is an act within the discretion of a committee in charge of a tournament, such as the U.S. Open.

■ Once the ADA plaintiff establishes that the requested accommodation is reasonable in a general sense, the burden shifts to the defendant to prove that the modification would fundamentally alter the nature of the public accommodation. *See Johnson v. Gambrinus Company/Spoetzl Brewery,* 116 F.3d at 1059. Proof must focus on the specific circumstances rather than on reasonableness in general. *See id.* at 1059–1060.

The proper inquiry, then, is not whether the requested accommodation would amount to a fundamental alteration in the game of golf (plainly, it would not), but rather whether the requested accommodation would constitute "a fundamental alteration in the nature of a program," *Southeastern Community College v. Davis,* 442 U.S. at 410, 99 S.Ct. 2361, and the "program" here at issue is the U.S. Open.

The USGA maintains that walking is required in the U.S. Open because the tournament is intended to serve as a test of stamina—of physical conditioning and ability to deal with stress—as well as a test of golf. In an odd way, this claim finds corroboration in the USGA's allowance of the use of carts in others of its tournaments. The USGA allows carts in the U.S. Senior Men's Amateur and in the U.S. Senior Women's Amateur, both of which are conducted in the autumn for competitors at least 55 years of age. The unavailability of caddies in sufficient number provides one reason carts are allowed in those events, but the USGA also notes that those competitions are not intended to bestow an unqualified title of "national champion"—the title the USGA bestows upon the winner of the U.S. Open. The USGA does not consider the level of competition in these events to be as great as in the U.S. Open. The court sees no inconsistency in the USGA's allowing carts in some events while barring them in what they view as the national championship.

Several reasons were offered at trial for the ban on golf carts. Some would be far less persuasive standing alone. For example, Ken Venturi, who brings the expertise of a past U.S. Open champion (1964) and one who covers golf tournaments on a regular basis for CBS, testified that the

use· of carts could affect the tournament's outcome by affecting the lie of the ball (how the ball sits on the turf) when it comes to rest after a stroke. The player who precedes the cart might hit the ball to a given spot in the rough and have to hit from grass several inches deep; the player who follows the cart might hit to the same spot and be able to hit a ball sitting atop grass that had been flattened by a cart's tire. Conversely, the player who precedes the cart might have a good lie in the fairway, while the player behind the cart might have a poorer lie by virtue of the ball having come to rest where the much shorter fairway grass was affected by a cart tire. These are things that happen regularly during casual play, so they are part of the game of golf—but they are not part of the U.S. Open. Still, it is doubtful whether these concerns would carry the day were they all the USGA had to offer: the evidence at trial indicated that caddies are allowed to drive carts during the local qualifying at South Bend Country Club. Perhaps the qualifying rounds differ from the championship, but the USGA won't let Mr. Olinger use a cart in the qualifying rounds.

Two points are far more persuasive to the court. First, the USGA's evidence has persuaded the court that the use of a cart can provide a golfer with a competitive advantage over a golfer who walks. Dr. James Rippe, an expert in the physiology of walking, conducted a study of extant medical literature and concluded that an average able-bodied 25–35 year-old golfer who rides a cart for an average round of golf on an average summer day (80°F, 50% relative humidity) has a significant and unfair advantage over an average able-bodied 25–35 year-old golfer who is walking. The person who walks the course

under those conditions performs the same amount of physiologic work as if he had run 11–minute miles for 2.5 hours, and studies indicate that such exertion causes cognitive and psychomotor tasks to deteriorate at rates between 10 and 50 percent.

The court agrees with Mr. Olinger that a comparison between average able-bodied golfers is not the issue before the court: Mr. Olinger is not an average, able-bodied golfer. Before addressing this point of agreement, however, the court disagrees with two other points of Mr. Olinger's criticism of Dr. Rippe's study. First, working from the study's assumptions, Mr. Olinger extrapolates that Dr. Rippe's hypothetical golfer walks for an average of 1.1 minutes and stops,[5] and Mr. Olinger then criticizes Dr. Rippe's conclusions to the extent they are based on literature that looks to fatigue from, for example, 30 continuous minutes of walking. The court agrees that a round of golf is not a continuous 4½ hour walk, but Mr. Olinger's criticism assumes a walk of equal distance between shots, and golf shots vary greatly in distance, and his criticism also seems to assume rest between shots rather than engagement in the game of golf. Dr. Rippe's report of the physiologic work involved in golf comes from a study of golf, not from a study of military marksmanship.

Mr. Olinger also criticizes Dr. Rippe (and those who commissioned his study) for not engaging in what Mr. Olinger submits as an easy test of Dr. Rippe's hypothesis that fatigue affects golfing performance. Mr. Olinger suggests that the USGA could look· at its own records and see if golfers' scores worsen as the tournament goes on. The court does not believe

5. Dr. Rippe assumed the round of golf takes 4 hours and 30 minutes, which, when divided between 18 holes, produces an average of 15 minutes per hole. Dr. Rippe further assumed that the walking golfer walks about 30% of the time, and so would be walking for 4.5 minutes of the 15–minute per-hole average. Assuming a scratch golfer would complete the round in 72 strokes (with the course presenting the same number of par 5 holes as par 3 holes) produces an average of 4 strokes per hole. Averaging the averages of 4 strokes per hole and 4.5 minutes of walking per hole produces a quotient of a little over 1.1 minute of walking per stroke.

such a statistical analysis would prove (or disprove) anything. Nothing presented at this trial suggests that fatigue is the sole influence on a golfer's score. Mr. Olinger's proposed calculation would assume four days' absolute uniformity of matters such as temperature, humidity, wind, precipitation, pin placements—all things shown by this record to affect a golfer's score.

Still, Mr. Olinger is correct that a comparison between able-bodied golfers does not resolve this case. Dr. Rippe's study reveals nothing about whether an able-bodied golfer who walks without pain would be disadvantaged in any way by a golf cart for Ford Olinger, for whom the very act of walking is fatiguing, and who, to play the sport even with the aid of a cart, does more walking than strictly necessary for locomotion so as better to evaluate his next shot. Dr. Rippe conceded that his report gives no such information; while he can posit the average able-bodied golfer, he does not believe he can provide a study assuming an average disabled golfer because the variety of potential disabilities (and of the individual impact of each such disability) is too great.

The court believes that Dr. Rippe's report provides a strong basis to believe that as between two roughly similar golfers, the golfer who rides is likely to have some advantage when it comes to fatigue over the golfer who walks. The extent of that advantage no doubt is variable and unmeasurable. Dr. Rippe's testimony leads the court to believe that the advantage would vary with temperature, humidity, terrain, number and types of strokes—and probably would vary with the nature and extent of the person's disabilities. The

walking golfer still might choose to walk, if the golfer's abilities allowed: Mr. Olinger noted many competitive reasons a professional golfer might prefer walking to riding, and about a quarter of the participants walk in tournaments in which the USGA allows carts. Again, that choice might be influenced by things as measurable as temperature, humidity or terrain, or by things as immeasurable as how the golfer felt that day or how well he slept the night before. The court finds not that a golfer who rides invariably has a competitive advantage over a very similar golfer who walks; the court finds only that a strong possibility exists that on any particular day, such a competitive advantage might exist, and that it might be substantial.

Not much competitive advantage appears to be needed to affect the outcome of a U.S. Open. Slightly over 100 U.S. Opens have been played, and on 30 occasions, a playoff was needed to decide the winner, so a single stroke can be determinative.[6] The record does not tell us the average winning score of a U.S. Open, but Mr. Venturi testified to rounds totaling 278 in 1964; the difference between that score and 279 is a little over a third of a percent.[7]

Mr. Olinger notes that in the last 13 years, only 11 golfers have asked permission to ride in the U.S. Open. From that statistic, it might be inferred that comparable golfer—the golfer as to whom Mr. Olinger would have a competitive advantage were he allowed to ride—either does not exist, or has not sought permission to use a cart in the U.S. Open. This brings the analysis to the second of the USGA's persuasive points: who would make such a determination? This court has been able

---

6. One would think that a single stroke would have an impact on money won or lost below the levels of a first and second places, but the trial record offers no information on that suspicion.

7. Defendant's Exhibit D, the USGA publicity videotape of Mr. Venturi's triumphant Open, reveals that Mr. Venturi actually won the tournament by 4 strokes, and that Mr. Venturi's score of 278 was not a representative winning score (only one other winning score was below 280 by that time). But Mr. Venturi's is the only winning score identified in the trial record, and percentage would be even lower were a more common winning score used.

to decide Mr. Olinger's need to ride a cart with the assistance of excellent attorneys who have had access to far more information than the court ultimately needed. The USGA's application form does not demand that sort of information from applicants. Perhaps the USGA could demand such information, but the USGA then also would need to develop a system and a fund of expertise to determine whether a given applicant truly needs, or merely wants, or could use but does not need, to ride a cart to compete.

Once the inquiry moves beyond Mr. Olinger, the issue broadens and becomes far more difficult. Ford Olinger must ride a golf cart to play, and even with a cart he is likely to be more fatigued at the day's end than a healthy Tiger Woods or a healthy David Duvall. Perhaps it will be easy to say the same thing about next year's applicant for cart use—but how will that applicant be compared to Ford Olinger? Will next year's applicant for permission to ride have a competitive advantage over Mr. Olinger if allowed to ride? Will Mr. Olinger have a competitive advantage over next year's applicant if both are allowed to ride? If either would have an advantage over the other, would one be allowed to ride? or both? or neither?

A court deciding a case under the ADA must make an individualized decision concerning the plaintiff, but a court evaluating a requested accommodation's impact on the nature of an activity or program also must give full consideration to that impact. The U.S. Open never has used rules or discretionary decisions for the purposes of giving one competitor a systemic advantage over another. All competitors play by the same rules: they hit from the same tees; they are bound by the same limits concerning the number of clubs they may carry; none may switch to a different type of ball during a round. To require that someone be given the discretion to allow one competitor a potential advantage denied to others would funda-

mentally alter the nature of the competition.

The only alternative would be to take the discretion out of the accommodation, and allow all U.S. Open competitors to ride golf carts if they so choose. To do so, however, would be to remove stamina (at least, a particular type of stamina) from the set of qualities designed to be tested in this competition. Conditions that now affect a golfer's performance, but which lie beyond the golfer's ability to control—the fatigue born of hills, of heat, of humidity—would lessen in importance to the competition. Again, the nature of the competition would be fundamentally altered.

It is important, especially when a court deals with athletic competition, not to allow "stamina" or "nature of the program" to become a proxy for discrimination against persons protected by the ADA. That vigilance is no less important when the requested accommodation is one afforded to thousands of weekend (and weekday) golfers and even to golfers in other professional events, including events conducted by the USGA. As noted before, though, it is also important to remain focused on the nature of the "program" to which Mr. Olinger seeks access: the U.S. Open. Based on this record, the court is convinced both that the requested accommodation would fundamentally alter the nature of the U.S. Open, and that the "nature" of the program is not a proxy for discrimination against persons who, like Mr. Olinger, cannot walk a golf course.

Athletic competition presents ADA concerns different from those presented by the workplace. In the workplace, the pertinent inquiry is whether a particular otherwise qualified individual can perform the job if a reasonable accommodation is made to allow for the person's disability. The point of an athletic competition, in contrast, is to decide who, under conditions that are about the same for everyone, can perform an assigned set of tasks better than (not as well as) any other competitor. The set of tasks assigned to the competitor

in the U.S. Open includes not merely striking a golf ball with precision, but doing so under greater than usual mental and physical stress. The accommodation Mr. Olinger seeks, while reasonable in a general sense, would alter the fundamental nature of that competition.

## IV

For these reasons, the court finds for the defendant and against the plaintiff on the plaintiff's complaint. The clerk shall enter judgment for the defendant.