Casey **MARTIN**, Plaintiff–Appellee,

v.

**PGA TOUR, INC., a Maryland corporation, Defendant–Appellant.**

Nos. 98–35309, 98–35509.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1999.

Decided March 6, 2000.

William J. Maledon, Andrew D. Hurwitz, Osborn Maledon, Phoenix, Arizona, for the defendant-appellant.

Roy L. Reardon, New York, New York, for the plaintiff-appellee.

Thomas E. Chandler, United States Department of Justice, Washington, D.C., for amicus United States; Guy G. Ward, Mayer, Brown & Platt, Chicago, Illinois, for amicus U.S. Golf Association; Brian D. Shannon, Texas Tech University School of Law, Lubbock, Texas, for amicus Klippel-Trenaunay Syndrome Support Group.

Before: CANBY and T.G. NELSON,

Circuit Judges, and FOGEL,[1] District Judge.

CANBY, Circuit Judge:

PGA Tour, Inc. ("PGA") appeals from the district court's decision in favor of Casey Martin, a disabled professional golfer, ordering PGA to make an exception to its "walking rule" to allow Martin to ride a golf cart during PGA competitions. We conclude that the Americans with Disabilities Act ("ADA") applies to PGA competitions and that allowing Martin to use a cart is a reasonable accommodation that does not fundamentally alter the nature of those events. We therefore affirm the district court's decision.

## BACKGROUND

Casey Martin suffers from Klippel–Trenaunay–Weber Syndrome, a congenital, degenerative circulatory disorder that is manifested in a malformation of his right leg. This disorder causes Martin severe pain and atrophy in his lower leg, rendering him unable to walk for extended periods of time. The mere act of walking subjects him to a significant risk of fracture or hemorrhaging. There is no dispute that Martin is profoundly disabled.

PGA is a non-profit association of professional golfers.[2] It sponsors three competitive tours: (1) the PGA Tour, its most competitive tour, (2) the Nike Tour, one step down from the PGA Tour, and (3) the Senior PGA Tour, restricted to professional golfers age 50 and over. On days of tour competition, PGA is the operator of the golf course.[3]

The primary means of gaining entry to the PGA Tour and Nike Tour is by a competition known as the qualifying school. The best scorers in that competition qualify for the PGA Tour, and the next-best finishers qualify for the Nike Tour. Players in the Nike Tour may qualify for the PGA Tour by winning three Nike Tour tournaments in one year or by being in the top fifteen money-winners in the Nike Tour.

The qualifying school competition is conducted in three stages. In the first two stages, players are permitted to use golf carts. In the third stage, and in the PGA and Nike Tours themselves, players are required to walk as they play the course.[4] After qualifying for the third and final stage of the 1997 qualifying school, Martin requested permission from PGA to use a golf cart. PGA denied this request, and Martin sued.

The district court granted Martin a preliminary injunction and, using a golf cart, he performed well enough in the final stage of the qualifying school to earn a spot on the 1998 Nike Tour. The court subsequently granted Martin partial summary judgment, holding that PGA is subject to Title III of the ADA because it owns, operates and leases golf courses, which the ADA identifies as places of public accommodation.[5] *Martin v. PGA Tour, Inc.*, 984 F.Supp. 1320 (D.Or.1998). After a six-day bench trial, the district court concluded that modifying the walking rule

1. The Honorable Jeremy Fogel, United States District Judge for the Northern District of California, sitting by designation.

2. We refer hereafter to the defendant PGA Tour, Inc. as "PGA," in order to differentiate it from the PGA Tour, which is one of the three tours sponsored by PGA Tour, Inc.

3. The term "operates," as it is used in the ADA, is extensive and "would include sublessees, management companies, and any other entity that owns, leases, leases to, or operates a place of public accommodation, even if the operation is only for a short time." 28 C.F.R. ch. I, pt. 36, app. B., at 628 (1999).

4. Players are permitted to use golf carts on the Senior Tour.

5. The district court also ruled that PGA is not exempt from the ADA as a "private club," *see* 42 U.S.C. § 12187, because, among other reasons, it is a commercial enterprise offering athletic events to the public. *Martin*, 984 F.Supp. at 1326. PGA has not challenged that ruling on this appeal.

for Martin was a reasonable accommodation that did not fundamentally alter the nature of PGA golf tournaments. *Martin v. PGA Tour, Inc.*, 994 F.Supp. 1242 (D.Or.1998). It accordingly entered a permanent injunction requiring PGA to permit Martin to use a golf cart in PGA and Nike Tour competitions in which he is eligible to participate, and in any qualifying rounds for those tours. PGA appeals.[6]

## DISCUSSION

### I. *Applicability of Title III (Public Accommodation)*

■ The district court granted Martin's motion for summary judgment, holding that, as a matter of law, Title III of the ADA applies to the PGA and Nike Tour competitions. We review de novo the district court's interpretation of the ADA. *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir.1999).

■ We begin our analysis, as did the district court, with the terms of the statute. The basic anti-discrimination clause of Title III of the ADA provides:

No individual shall be discriminated against on the basis of disability in the full enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). The first issue for decision is whether Martin seeks to enjoy the facilities of a "place of public accommodation." The definition section of Title III of the ADA provides:

The following private entities are considered public accommodations for purposes of this subchapter . . .

.    .    .    .    .

(L) a gymnasium, health spa, bowling alley, *golf course,* or other place of exercise or recreation.

42 U.S.C. § 12181(7)(L) (emphasis added). There is nothing ambiguous about this provision; golf courses are public accommodations. Indeed, PGA does not dispute that during one of its tournaments a golf course is a public accommodation with regard to the spectator areas; its contention is that the competitors' area "behind the ropes" is not a public accommodation because the public has no right to enter it. Despite the surface plausibility of this argument, it too narrowly construes the nature of a public accommodation.

■ The district court held that a public accommodation could not be compartmentalized in the fashion PGA desired. At least in the present context, we agree. It is true that the general public cannot enter the area "inside the ropes," but competitors, caddies, and certain other personnel can. PGA contends that the restricted area is not being used as a "place of exercise or recreation," within the meaning of § 12181(7)(L), because the competitors are trying to win money, not exercise or recreate. Even if we were to agree with this point, it would not aid PGA. The statute also defines "public accommodation" to include a "theater, . . . stadium or other place of exhibition or entertainment." 42 U.S.C. § 12181(7)(C). If a golf course during a tournament is not a place of exercise or recreation, then it is a place of exhibition or entertainment. The statute does not restrict this definition to those portions of the place of exhibition that are open to the general public. The fact that entry to a part of a public accommodation may be limited does not deprive the facility of its character as a public accommodation. *See Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698, 759 (D.Or.1997) (arena's executive suites

---

**6.** The district court awarded Martin attorneys' fees and costs. PGA has protectively appealed that order; it does not contest the amount but seeks reversal of the award if it succeeds on appeal. Because we affirm on the merits, we also affirm the award of fees and costs to Martin as the prevailing party.

contracted by businesses are public accommodations). Indeed, the underlying premise of the cases dealing with disabled student athletes is that Title III applies to the playing field, not just the stands. *See, e.g., Bowers v. National Collegiate Athletic Ass'n,* 9 F.Supp.2d 460, 483–90 (D.N.J. 1998); *Tatum v. National Collegiate Athletic Ass'n,* 992 F.Supp. 1114, 1121 (E.D.Mo.1998); *Ganden v. National Collegiate Athletic Ass'n,* 1996 WL 680000, at *8–11 (N.D.Ill. Nov.21, 1996); *see also Anderson v. Little League Baseball, Inc.,* 794 F.Supp. 342, 344 (D.Ariz.1992) (undisputed that Title III applies to access to coaches' box on baseball field).

The Third Circuit dealt with a somewhat analogous problem in *Menkowitz v. Pottstown Memorial Medical Center,* 154 F.3d 113 (3d Cir.1998). There a physician with a disability sued a hospital under Title III after it denied him hospital staff privileges. The Third Circuit rejected the argument that Title III could be invoked only by the patients of a hospital, and held that denial of staff privileges qualified as a denial of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" prohibited by Title III, § 12182(a). *Id.* at 122. Staff privileges, of course, entail access to parts of the facility to which patients and the general public are denied entry.

In contending that it may compartmentalize golf courses during tournaments, PGA leans heavily on two examples set forth in the regulations. One is of a "mixed use facility," in the form of a large hotel that has a separate residential wing. *See* 28 C.F.R. ch. I, pt. 36, app. B, at 623 (1999). The non-public residential wing (which would be covered by the Fair Housing Act) is not a place of "public accommodation." *See id.* The hotel wing, however, would fall under 42 U.S.C. § 12181(7)(A) as an "inn, hotel, motel, or other place of

lodging." 28 C.F.R. ch I, pt. 36, app. B, at 623; *see* 42 U.S.C. § 12181(7)(A). But in this example, the residential wing has never functioned as a hotel. A golf course during a tournament, however, is serving as a golf course.

The other example cited by PGA is that of a commercial facility, such as a factory, that allows public tours over specific routes at particular times. *See* 28 C.F.R. ch. I, pt. 36, app. B, at 624. The tour route is a public accommodation but the portions of the facility merely viewed from that route are not. *See id.* There are two reasons why this example is not persuasive. First, it applies to commercial facilities "not otherwise a place of public accommodation." *Id.* Second, the example would be analogous only if Martin were a *spectator* seeking to use his golf cart within the competitors' area of a tournament.

■ This point brings us to the greatest difficulty with PGA's argument. It assumes that there is nothing public about the competition itself. According to PGA, the fact that its tournaments are restricted to the nation's best golfers means that the courses on which they play during tournaments *cannot* be places of public accommodation. But the fact that users of a facility are highly selected does not mean that the facility cannot be a public accommodation. For example, Title III includes in its definition "secondary, undergraduate, or post-graduate private school[s]." 42 U.S.C. § 12181(7)(J). The competition to enter the most elite private universities is intense, and a relatively select few are admitted. That fact clearly does not remove the universities from the statute's definition as places of public accommodation. It is true that the rest of the public is then excluded from the schools, but the students who are admitted are nevertheless members of the public using the universities as places of public accommodation.[7]

7. Title III does not restrict its coverage to members of the public; it provides that "No *individual* shall be discriminated against" in

the enjoyment of public accommodations by reason of disability. 42 U.S.C. § 12182(a) (emphasis added). This provision does not,

Competition to enter the select circle of PGA and Nike Tour golfers is comparable. Any member of the public who pays a $3000 entry fee and supplies two letters of recommendation may try out in the qualifying school. At the initial stage, it seems plain that the golf course on which the elimination begins is a place of public accommodation. As even PGA admits, "[t]he competition areas of some amateur sporting events may well constitute places of public accommodation under Title III of the ADA when virtually any member of the public can participate." We fail to see, however, why a winnowing process would change the nature of the facility. If a stadium owner invited the public to compete in long distance races, and continued to run heats until only the ten best runners remained, the track would be no less a place of public accommodation when the final race was run. We see no justification in reason or in the statute to draw a line beyond which the performance of athletes becomes so excellent that a competition restricted to their level deprives its situs of the character of a public accommodation. Nor do we see any such justification for drawing a line between use of a place of public accommodation for pleasure and use in the pursuit of a living.

We conclude, therefore, that golf courses remain places of public accommodations while a PGA tournament is being conducted on them.

II. *Reasonable Modification (Accommodation)*

Title III further defines "discrimination" to include:

a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications *would fundamentally alter the nature* of such goods, services, facilities, privileges, advantages or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).

■ Here, it is clear that permitting Martin to use a golf-cart is "reasonable" in the sense that it solves the problem of Martin's access to the competition. It is also "reasonable," as the district court found, in that golf-carts are used in other competitions (such as those on the Senior Tour), and it is not a difficult practical matter to permit them. Use of a golf cart is also "necessary"; there was ample evidence to support the district court's finding that Martin could not walk the course, even with artificial aids. These matters are no longer in serious contention.

■ The issue on which most of the dispute centers is whether permitting Martin to use a golf cart will "fundamentally alter" the nature of the goods or service—the PGA or Nike Tour. It is readily apparent that walking is not essential to the generalized game of golf. Rule 1–1 of the Rules of Golf, promulgated by the United States Golf Association and the Royal and Ancient Golf Club of St. Andrews, Scotland, states:

The Game of Golf consists in playing a ball from the teeing ground into the hole by a stroke or successive strokes in accordance with the Rules.

These Rules do not require players to walk. Indeed, PGA does not require players to walk in the early stages of the qualifying school or in the Senior Tour.

PGA correctly points out, however, that it is not offering the generalized game of golf in its PGA and Nike Tours, it is offering a particular competition. PGA provides, in the Conditions of Competition for its PGA and Nike Tours, that "[p]layers shall walk at all times during a stipu-

---

however, grant access to a place where the individual is not entitled to be; the rejected applicant for admission is not entitled to access to the university, and the spectator is not entitled to access to the tees, fairways and greens during a PGA golf tournament.

lated round unless permitted to ride by the PGA TOUR Rules Committee." On occasions when the Committee has permitted players to ride, the waiver applies to all competitors, as when all players must be shuttled from the 9th green to the 10th tee when the distance is great. It also appears that, to save time, rides have been given from the fairway back to the tee to players who have lost a ball and must tee off again.

The issue for decision, then, is whether the accommodation of permitting Martin to use a golf cart fundamentally alters the PGA and Nike Tour competitions. That issue was fully tried in the district court.

The district court found that the purpose of requiring players to walk was to inject a fatigue factor into the shot-making of the game. *Martin*, 994 F.Supp. at 1250. It also found, however, that "the fatigue factor injected into the game of golf by walking the course cannot be deemed significant under normal circumstances." *Id.* It further found that, at the low levels of intensity of exercise involved in untimed walking of a golf course during a competition, "fatigue ... is primarily a psychological phenomenon.... Stress and motivation are the key ingredients here." *Id.* at 1251. The court noted that, given the choice of carts or walking in other tours, large numbers of players chose to walk. *See id.* In the events in which PGA permits carts, it assigns no handicap penalty to those who ride as opposed to those who walk. *See id.* at 1248.

There was ample evidence to support all of these findings, and they are not clearly erroneous. Against this background, the district court evaluated whether use of a cart would give Martin an advantage over the other players who were required to walk. Even with a cart, Martin must walk about twenty-five percent of the course because the cart cannot be brought near to the ball in many cases. Martin endures

significant pain while walking, and while getting in and out of his cart. The district court, after considering these factors, found that Martin "easily endures greater fatigue even with a cart than his able-bodied competitors do by walking." *Id.* at 1252.

In light of these findings, we conclude, as did the district court, that permitting Martin to use a golf court in PGA and Nike Tour competitions would not fundamentally alter the nature of those competitions. The central competition in shot-making would be unaffected by Martin's accommodation. All that the cart does is permit Martin access to a type of competition in which he otherwise could not engage because of his disability.[8] That is precisely the purpose of the ADA. *See* 42 U.S.C. § 12101(a)(5) (discrimination against disabled includes "failure to make modifications to existing facilities and practices"); *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir.1996) (Congress intended ADA to cover discriminatory impact of facially neutral barriers).

PGA argues that the kind of balancing engaged in by the district court and now by this court is wholly illegitimate. It agrees that some athletic rules, such as dress codes or uniform requirements, may be subject to exceptions to accommodate the disabled. But it contends that a rule intended to affect the competition cannot be made subject to exception. According to PGA, the case should have ended in its favor the moment the district court concluded that the purpose of PGA's walking-only rule was to inject the fatigue factor into the competition. Once that rule is determined to be "substantive," according to PGA, it is not subject to exceptions to accommodate disability.

■ The difficulty with this position is that it reads the word "fundamentally" out of the statutory language, which requires

---

**8.** We note that the NCAA and Pac–10 rules of competition require players to walk and carry their own clubs. Martin applied for, and was granted, a waiver of that rule that permitted him to compete in college tournaments when he was a student.

reasonable accommodation unless PGA can demonstrate that the accommodation would "fundamentally alter the nature" of its competition. 42 U.S.C. § 12182(b)(2)(A)(ii). PGA essentially argues that permitting a player to ride alters the competition and inquiry must stop there. It makes all alterations of the competition fundamental. But the statute mandates an inquiry into whether a particular *exception* to a rule would *"fundamentally* alter" the nature of the good or service being offered. The issue here is not whether use of carts generally would fundamentally alter the competition, but whether the use of a cart by Martin would do so. The evidence must "focus[ ] on the specifics of the plaintiff's or defendant's circumstances and not on the general nature of the accommodation." *Johnson v. Gambrinus Co./Spoetzl Brewery,* 116 F.3d 1052, 1060 (5th Cir.1997). We cannot tell whether a golf cart for Martin fundamentally alters the competition without first investigating whether walking is fundamental to the competition. The mere fact that PGA has defined walking to be part of the competition cannot preclude inquiry, or PGA will have been able to define itself out of reach of the ADA. The district court, as we have said, found that the fatigue factor injected into the game by walking was not significant, and that finding was not clearly erroneous.

■ The nature of the district court's findings reflect the fact that whether an accommodation fundamentally alters a competition is an intensively fact-based inquiry. For that reason, we reject PGA's argument that permitting Martin to use a golf cart would open the door to future decisions requiring that disabled swimmers or runners be given a head start in a race, or that a growth-impaired basketball player be allowed to shoot 3–point baskets from inside the three-point line. We have little doubt that fact-based inquiries into the effects of such accommodations would result in rulings that those accommodations fundamentally altered the competi-

tions. The same would be true if Martin were seeking to use a special golf ball that carried farther than others, or was seeking to play a shorter course than his competitors. Martin, however, seeks only to use a cart between shots, and the district court, after considering the evidence presented in a full trial, found that this accommodation does not fundamentally alter the competition.

PGA next contends that it was wholly improper for the district court to consider whether Martin's condition was such that riding would not give him an unfair advantage over competitors who walked. PGA has steadfastly declined to consider Martin's condition in adhering to its position that permitting him to use a cart would fundamentally change its competition. It contends that it would be far too burdensome for PGA to determine whether disabled individuals using carts would have an advantage over non-disabled walking competitors. PGA relies on *Sandison v. Michigan High Sch. Athletic Ass'n,* 64 F.3d 1026 (6th Cir.1995), which upheld an upper-age limit for high school athletes. *Sandison* rejected an argument that overage would not provide a competitive advantage for the learning-disabled plaintiffs because they were of only average athletic ability; it stated that "[i]t is plainly an undue burden to require high school coaches and hired physicians to determine whether [various] factors render a student's age an unfair competitive advantage." *Id.* at 1035; *see also McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453, 462 (6th Cir.1997) (upholding maximum eight-semester eligibility rule on same grounds); *Pottgen v. Missouri State High Sch. Activities Ass'n,* 40 F.3d 926, 931 (8th Cir.1994) (same).

The foundation of these cases, however, was a finding, or evidence compelling a finding, that the rule against older or more experienced high-school athletes was necessary to protect the competition in the lower age group, and to prevent "redshirting" of athletes to permit them to

compete when older and more experienced than the others. *See Sandison,* 64 F.3d at 1035; *McPherson,* 119 F.3d at 462; *Pottgen,* 40 F.3d at 931 & n. 6. The record in this case is quite different; the district court found that the fatigue factor introduced by walking was not significant.[9]

Moreover, we do not share the antagonism to individual determinations reflected in these cases. "We prefer the approach of Judge Richard Arnold, dissenting in *Pottgen,* that the inquiry must focus on the *individual* exception and that, in light of the plaintiff's individual characteristics as found by the district court, the age requirement could be modified for this individual player without doing violence to the admittedly salutary purposes underlying the age rule." *Pottgen,* 40 F.3d at 932 (dissenting opinion). The Seventh Circuit adopted such an approach in *Washington v. Indiana High Sch. Athletic Ass'n,* 181 F.3d 840 (7th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999), in enjoining enforcement of an eight-semester rule against a learning-disabled student. It observed that applying the eight-semester rule to exclude the particular plaintiff would not "add anything to the protections provided by the IHSAA's age limit rule, which generally limits the size, strength and athletic maturity of student athletes." *Id.* at 852. The court continued:

> Nor will the record support the argument that a waiver of the rule in Mr. Washington's case would place an undue administrative or financial burden on the IHSAA. The record indicates that Mr. Washington is the only student athlete to seek a waiver because of a learning disability in more than a decade. The few case-by-case analyses that the

IHSAA would need to conduct hardly can be described as an excessive burden. *Id.* Much the same can be said here. Nothing in the record establishes that an individualized determination would impose an intolerable burden on PGA. Although PGA refused to consider the effect of Martin's disability, the district court appeared to have little difficulty making the factual determination that providing Martin with a golf cart would not give him an unfair advantage over his competitors. We conclude that, under the ADA, that determination was a proper one for the court to make. *See Johnson,* 116 F.3d at 1059–60 (fundamental alteration defense focuses on individual circumstances).

## CONCLUSION

We conclude that, under Title III of the ADA, a golf course is a place of public accommodation while PGA is conducting a tournament there. We also conclude that the district court did not err in determining that the provision of a golf cart to Martin was a reasonable accommodation to his disability, and that use of the cart by Martin did not fundamentally alter the nature of the PGA and Nike Tour tournaments. We accordingly affirm the judgment of the district court.[10]

AFFIRMED.

---

9. This finding also distinguishes Martin's case from *Olinger v. United States Golf Ass'n,* 55 F.Supp.2d 926 (N.D.Ind.1999), in which the district court found on the evidence there presented that use of a cart can provide a golfer with a competitive advantage over a golfer who walks. *See id.* at 935. To the

extent that other rulings in *Olinger* are inconsistent with our decision today, we respectfully disagree with it.

10. Our ruling that Martin is entitled to relief under § 12182(a) of Title III makes it unnecessary to address his alternative arguments.